**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John Newark WEST,
Defendant–Appellant.**

No. 88–3766.

United States Court of Appeals,
Eleventh Circuit.

April 25, 1990.

Kirk N. Kirkconnell, Winter Park, Fla., Nathan L. Bond, Tallahassee, Fla., for defendant-appellant.

Robert Moreno, H. Manuel Hernandez, Asst. U.S. Attys., Orlando, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

John Newark West appeals from a conviction and sentence for use of an interstate commerce facility (a telephone) for solicitation of murder in violation of 18 U.S.C. § 1952A. In particular, he appeals both evidentiary rulings and jury instructions given by the district court; he also challenges the validity of certain sections of the sentencing guidelines. We affirm the rulings of the district court, and we uphold the validity of the sentencing guidelines.

## FACTS

In 1986, the appellant, John Newark West, began searching for an "absentee owner" business in which he could invest. In November of that year, he invested in a

motorcycle shop called Cycles of Longwood, joining Charles Morgan and James Coughlin as a third partner. West owned sixty percent of the corporate stock.

By the end of 1986, West, Morgan and Coughlin accepted a $250,000 loan from Sun Bank, secured in part by a second mortgage on West's home and a $100,000 assigned life insurance policy on West's, Morgan's and Coughlin's life. Morgan left Cycles of Longwood in May, 1987; after he left, West's father invested an additional $50,000 into the store. Nonetheless, the business deteriorated, and in late November, 1987, Coughlin resigned, forfeiting his stock shares in the store, and leaving West to run the store alone.

In August or September, 1987, West began confiding in an old friend, Doug Kimball, about his business problems, and in particular about his overstocked inventory. West began by discussing the possible destruction of his business by either arson or by a staged burglary, and later discussed hiring a hitman to murder Coughlin. Although West did not realize it, Kimball was an FBI informant.

Beginning on January 24, 1988, Kimball began recording his telephone conversations with West. Kimball arranged for West to meet with a supposed hitman named "Chuck," who was actually an FBI special agent named Clifford Botyos. West spoke with Botyos on the telephone at his home the day before meeting with the hitman at a hotel in Orlando. West testified that he was at another Orlando hotel on February 2, 1988, on unrelated business, had "one maybe two drinks," and then called his wife.

Mrs. West told her husband that "Chuck" (the hitman) had called, and, according to West, became annoyed by his reluctance to return the phone call. At any rate, West returned the call and then met with Chuck at a separate hotel, (because according to West, "I was stupid, macho and half-drunk.") West testified that during this time period he hated Coughlin and felt "sick" about his financial problems at Cycles of Longwood, but that he never intended for the hitman to kill Coughlin.

On February 9, 1988, however, West did telephone Kimball and inform him that he would send $2500 in cash and an information packet for the hitman. West also testified, however, that he returned Kimball's phone call only because Kimball was leaving him messages, that he tried to avoid everything about the hitman after his meeting with Chuck, and that when he told Ronald Gitlin, the husband of an employee from the store, to "check out" the hitman, he did so only because he feared the hitman might be genuine.

The FBI arrested West on the morning of February 23, 1988, while he was driving from his home to work.

## TRIAL PROCEEDINGS

A grand jury indictment, returned March 23, 1988, charged West with two counts of violating the Federal Murder–For–Hire statute, 18 U.S.C. § 1952A, and with a third count of possessing an unregistered silencer in violation of 26 U.S.C. § 5861(d) and § 5871.

Counts I and II concerned two long distance telephone calls that West made, respectively, on January 25, 1988, and on February 9, 1988, for the alleged purpose of discussing the contract murder of Coughlin. The third count stemmed from the discovery, on February 23, 1988, of an unregistered silencer in West's car at the time of his arrest. The jury returned "not guilty" verdicts as to Counts I and III, but found West guilty of Count II, regarding the February 9, 1988 telephone call.

Before the government had called its first witness, the appellant raised a Rule 404(b) objection to the government's playing before the jury that portion of a recorded, February 9, 1988 telephone conversation where West had informed Kimball that a mutual acquaintance might be "next on the hit parade." The court, however, overruled the objection and allowed the government to play the exhibit in its entirety.

The appellant also raised relevancy and materiality objections to Coughlin's redirect testimony that both he and his family had gone into hiding after the FBI had

warned them of West's alleged plans. Furthermore, during the testimony of Botyos, the FBI undercover agent, the appellant raised Rule 404(b) objections to preclude the admission of government Exhibits 5, 7, 8 and 18 on the grounds that this evidence consisted of uncharged acts whose prejudicial impact greatly outweighed its probative value. Most of these exhibits consisted of taped telephone conversations between West and the supposed hitman Botyos; exhibit # 8, however, was a video and audio tape recording of a meeting between West and this same individual. The district court admitted the exhibits into evidence, and the government played them before the jury.

Before the government played the video tape of West's meeting with Botyos, the government inserted a test-tape into its audio-visual equipment in order to insure that the equipment was functioning correctly. In front of the jurors, the government inadvertently inserted a portion of the tape which showed a CNN news broadcast recounting a violent shooting in California which had occurred several months before the trial. The broadcast, although startling, had nothing to do with the facts of the instant case, and showed no actual footage of the gunman or the shooting. After the government had turned off the tape, the defense immediately moved for a mistrial. The district court denied the motion, admonished the government, and asked the jurors to stand if "... you feel in any way that you were affected by that test tape in your ability to render a fair and impartial verdict in this case." No juror arose, and the trial continued.

Jury deliberations began on Monday, June 27, 1985. On Tuesday afternoon, June 28, the jury announced a deadlock, and the court recessed until the next morning. On Wednesday morning, June 29, the district court delivered what it termed a "modified, modified *Allen* charge" to the jury. After the instruction, the jury resumed its deliberations; late the next day, the jury returned a verdict finding West guilty as to Count II, and not guilty as to Counts I and III.

On September 15, 1988, the district court, in accordance with the sentencing guidelines, sentenced West to fifty-one months incarceration, (less credit for time served), based on an offense level of twenty-three. The court denied his request for a downward departure to twenty months, and ordered that West be under supervised release for a period of three years following his release from incarceration. This appeal followed.

## DISCUSSION

West appeals certain evidentiary rulings and jury instructions given by the district court; he also challenges the validity of the Sentencing Guidelines.

### A. HEARSAY OBJECTION

West first contends that the district court abused its discretion, or committed plain error, when it sustained the government's hearsay objection. The government objected when West attempted to testify about certain out-of-court statements that Mr. Kimball made to West in late 1987 and early 1988, during numerous unrecorded telephone conversations. West asserts that either the "state-of-mind" exception to the hearsay rule, or the co-conspirator subsection of Rule 801(d)(2)(E), would render those statements admissible.

We agree that although West's account of Mr. Kimball's statements during their telephone conversation would be hearsay, the state-of-mind exception to the hearsay rule would render them admissible. Rule 803(3) of the Federal Rules of Evidence allows the admission of "... [a] statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health) ..."

West now correctly contends that the district court improperly prevented him from testifying as to the effect of Mr. Kimball's statements on his state of mind. He also suggests that his testimony as to Mr. Kimball's statements would have shed important light on his defense that he lacked the requisite criminal intent. In

support of his argument, West cites a number of cases which hold that courts should admit statements which would otherwise be hearsay in order to show their effect on a defendant's state of mind. *See e.g., United States v. Kohan*, 806 F.2d 18 (2d Cir.1986); *United States v. Wright*, 783 F.2d 1091 (D.C.Cir.1986); *United States v. Herrera*, 600 F.2d 502 (5th Cir.1979); *United States v. Rubin*, 591 F.2d 278 (5th Cir. 1979), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979).

■ Although the district court may have incorrectly characterized West's version of Mr. Kimball's statements as inadmissible hearsay, Rule 103 of the Federal Rules of Evidence explicitly provides that "... error may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected, and ... the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Fed.R.Evid. 103(a)(2). Here, however, West made no attempt to inform the district court of the nature of Kimball's comments, influencing or otherwise, and we are therefore unable to determine whether their exclusion substantially prejudiced West's rights. Under these circumstances, we can only overturn the district court's ruling if we find that it was "plain error," as contemplated by Rule 52(b) of the Federal Rules of Criminal Procedure. This we will not do.

As we have noted recently in *United States v. Walther*, 867 F.2d 1334, 1343–1344 (11th Cir.1989), the plain error standard is a difficult one to meet; "... when examined in the context of the entire case [it must be] so obvious that failure to notice it would seriously affect the fairness, integrity and public reputation of judicial proceedings." Although West here seems to suggest that his testimony as to Kimball's statements might have supported a defense of entrapment, we note that even before West gave his testimony, West's counsel withdrew his proposed jury instruc-

tion on entrapment, conceding there was no entrapment in this case. Under these circumstances, we find that the district court's ruling did not significantly affect West's rights.

■ West also argues that the co-conspirator's exception to the hearsay rule 801(d)(2)(E) Fed.R.Evid., would have rendered Kimball's excluded telephone statements admissible as well. In support of this theory, West argues that Kimball's grand jury testimony revealed a concern that he might personally have violated the federal statute, 18 U.S.C. § 1952A, by his early, unrecorded telephone conversations with West. As we noted in *United States v. Alexander*, 850 F.2d 1500, 1505 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1346, 103 L.Ed.2d 814 (1989), however:

> In order for evidence to be admissible under Rule 801(d)(2)(E), the government must prove the following by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; and (3) that the statement was made during the course of and in furtherance of the conspiracy.

In the instant case, however, the district court could not have found that any such conspiracy existed, since West did not even attempt to assert a conspiracy theory at trial.[1] We therefore find no plain or substantial error, under *any* theory, for the district court's exclusion of this evidence.

## B. EXTRINSIC EVIDENCE

■ West next contends that the district court erred by admitting certain "extrinsic offense" evidence over his Rule 404(b) relevancy objections. We disagree.

West first challenges the district court's admission of a recorded, February 9, 1988 telephone call between West and Kimball; there West referred to someone other than Coughlin as being "next on the hit parade." West now contends that the district court should have excluded this reference as "ev-

---

1. Although West refers us to Kimball's grand jury testimony, there Kimball showed a concern only that if agents wiretapped West's telephone, they might prosecute him (Kimball) for "withholding evidence."

idence of other ... wrongs or acts" prohibited by Rule 404(b) Fed.R.Evid. If we were to overturn the district judge's decision to admit that statement, we would have to conclude that the court's admission of this evidence constituted an abuse of discretion. *See e.g., United States v. Kerris,* 748 F.2d 610, 614 (11th Cir.1984).

Our review of the tape recording convinces us that the appellant has mischaracterized the nature of this evidence. For the sake of clarity, we quote a portion of West's conversation with Coughlin:

> WEST: *I'm serious, man. Hey, you think we'd be talking about this other shit if I wasn't.*
> KIMBALL: Yeah.
> WEST: I mean we're not talking a Ray Ford, *we're talking,* you know, *we're talking, you know.*
> KIMBALL: Yeah.
> WEST: *Al Capone here.*
> KIMBALL: Uh-huh.
> WEST: Alright.
> KIMBALL: Hey do you even see Weasel anymore or no?
> WEST: No, uh huh.
> KIMBALL: History.
> WEST: Yeah, I've scrubbed that twenty grand off.
> KIMBALL: Huh.
> WEST: Yeah, there's no way I'll ever get it out of him.
> KIMBALL: Yeah.
> WEST: He might be less, *next* on the hit parade.
> KIMBALL: Yeah.
> WEST: Yeah, I'm not gonna worry about him for twenty. Fucker screwed me, you know, he'll get his somewhere else.
> KIMBALL: Yeah.
> WEST: *But this thing is serious.*

(Emphasis supplied). In our view, West's references to Ray Ford as "next on the hit parade" provide evidence, not of a prior wrongful act, since no act occurred, but of West's criminal intent. Here, West's comment that Ray Ford "might be next" strongly suggests that West intended that Coughlin might be *first* on this hit parade.

Moreover, West's reference to himself as Al Capone, and his insistence that "this thing is serious," are all examples that become highly probative of his own intent—the central factor at issue in his trial. We hold, therefore, that the district court properly admitted West's statement that Ray Ford might be "next on the hit parade."

■ West next asserts that the district court improperly admitted as evidence a videotape of his February 2, 1988 meeting with Botyos, an undercover FBI agent whom West incorrectly believed to be a hit man, and several related tape recordings of telephone calls discussing the arrangements for that meeting. West argues now that since the FBI's charges against him related only to his conduct on January 25, 1988 and February 9, 1988, his conference with Botyos on February 2 was irrelevant.

■ We have viewed the challenged videotape, and we find it highly probative on the issue of West's criminal intent. During his session with Botyos, West, to all appearances at least, negotiated the murder of Coughlin. He discussed Botyos' fee, the manner of payment, the possible date of the murder, his own plan to leave town during the pertinent period, and his planned method for handling possible questions from police. This evidence illustrated that West not only talked of having a hit man kill Coughlin; he actually met with Botyos to discuss arrangements. Although a prosecutor may not use extrinsic evidence simply to illustrate the defendant's bad character, he may certainly utilize the evidence when it illuminates the defendant's intent and motive, especially when, as here, the defendant's intent is the very element at issue in the trial. *See U.S. v. Elliott,* 849 F.2d 554, 560 (11th Cir.1988). Thus we hold that the district court did not abuse its discretion in admitting the challenged videotape.

■ West finally asserts that the district court wrongly admitted Coughlin's testimony that he and his family went into hiding after the FBI informed them that West had sought to hire a hit man. Although we

agree that Coughlin's state of mind was probably irrelevant, we note that on cross-examination West asked Coughlin if "the hit man [ever] came out to get you." We have noted in the past that inadmissible extrinsic evidence is admissible on redirect as rebuttal evidence, when defense counsel has opened the door to such evidence during cross-examination. *Elliott,* 849 F.2d at 559, *United States v. Johnson,* 730 F.2d 683, 691 (11th Cir.1984), *cert. denied,* 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 142 (1984). Here, since defense counsel implied during cross-examination that West's plans were meaningless, the government was entitled to elicit testimony from Coughlin on redirect that he took West's plans seriously. Further, Caughlin's testimony also illustrated that a hit man could not possibly have "[come] out to get" him, since the hit man could hardly target a man who had disappeared. We hold, therefore, that the district court properly admitted Coughlin's testimony that he and his family went into hiding.

### C. THE CNN VIDEOTAPE

■ During the trial, the government played a video test tape which inadvertently showed twelve seconds of a newscast of a violent shooting incident in California several months prior to the trial.[2] The defendant immediately moved for a mistrial. The district court then polled the jury to determine whether this viewing would affect either their deliberations or their ultimate verdict; the jurors indicated that the accidental viewing had not prejudiced them. The judge also gave the jury

**2.** The screen showed only a map of the State of California, with a red dot showing the location of the city where the shooting occurred.

**3.** The following is the text of the district court's *Allen* charge:

I'm going to ask that you continue your deliberations in an effort to reach agreement upon a verdict and dispose of this case, and I have a few additional comments I would like for you to consider as you do so.

This is an important case. If you should fail to agree upon a verdict, the case will be left open and may have to be tried again. There is no reason to believe that the case can be tried again by either side any better or more exhaustively than it has been tried before you.

clear instructions to disregard what they had seen, and then denied West's motion for a mistrial.

West now contends that the district court improperly denied his motion. As we noted earlier in *United States v. Cousins,* 842 F.2d 1245, 1247 (11th Cir.1988), *cert. denied,* ── U.S. ──, 109 S.Ct. 139, 102 L.Ed.2d 111 (1988), "... the decision to grant a mistrial based upon allegations that a jury has been unfairly prejudiced by exposure to extraneous information or outside influences is largely within the discretion of the district court and will not be reversed absent a showing that the trial judge abused its discretion."

Here we see no indication that the district court abused its discretion. The court properly polled the jury and determined that the accidental viewing had not affected its deliberations. Even more importantly, the newscast at issue did not even concern West's trial. As in *United States v. Bangert,* 645 F.2d 1297, 1306 (8th Cir. 1981), *cert. denied,* 454 U.S. 860, 102 S.Ct. 314, 70 L.Ed.2d 158 (1981), this claim "does not involve a claim of specific prejudicial publicity but, rather, a general claim of prejudicial publicity of world events during trial." The district court properly denied West's motion for a mistrial.

### D. THE ALLEN CHARGE

■ The jury deliberated for approximately eleven hours and then announced a deadlock; the district court then issued what it termed a "modified, modified *Allen* charge."[3]

Any future jury must be selected in the same manner and from the same source as you were chosen, and there is no reason to believe that the case could ever be submitted to twelve (12) men and women more conscientious, more impartial, or more competent to decide it, or that more or clearer evidence could be produced.

When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors.

Although the *Allen* charge has been the subject of controversy, this circuit has recognized its continued viability. *See United States v. Rey*, 811 F.2d 1453 (11th Cir. 1987), *cert. denied*, 484 U.S. 830, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987). The judge's instruction in the instant case was not a challenge to the minority to reexamine its views in deference to the majority; the judge never implied that the majority's position was correct. As we noted in *United States v. Gordon*, 817 F.2d 1538, 1543 (11th Cir.1987), *cert. dismissed*, 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 979 (1988), *modified*, 836 F.2d 1312 (11th Cir.1988), the "district court was entitled to encourage the jury to spend a reasonable amount of time deliberating, even after the jury indicated it was deadlocked." The instruction in this case, therefore, was no error.

### E. JURY INSTRUCTIONS ON ENTRAPMENT

During the trial West did not argue that the government witnesses had entrapped him, and during an off the record conference on jury instructions, his counsel agreed to withdraw a proposed instruction. During jury deliberations, however, the jury asked for clarification on the entrapment issue; the court did not respond, but referred the jury back to the original instructions.

West now contends that the district court abused its discretion by not submitting an entrapment instruction to the jury; in the alternative West asks that we review the court's procedure under the "plain error" standard of Rule 52(b) of the Federal Rules of Criminal Procedure.

West's contention, that the district court abused its discretion by not issuing an instruction that West himself had withdrawn, is clearly without merit. As the Supreme Court stated in *Johnson v. United States*, 318 U.S. 189, 200–01, 63 S.Ct. 549, 554–55, 87 L.Ed. 704 (1942), *citing United States v. Manton*, 107 F.2d 834, 838 (1938):

"If the failure to enter an exception or assign error had been a mere inadvertence the matter might stand in a different light. But that view cannot be indulged. Plainly enough, counsel consciously and intentionally failed to save the point and led the trial judge to understand that counsel was satisfied. We see no warrant for the exercise of our discretion to set aside standing rules, so neces-

You are not advocates for one side or the other. Do not hesitate to re-examine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.
I know that all of you have worked hard to try to find a verdict in this case. It apparently has been impossible for you so far. Sometimes an early vote before discussion can make it hard to reach an agreement about the case later. The vote, not the discussion, might make it hard to see all sides of the case. We are all aware that it is legally permissible for a jury to disagree. There are two things a jury can lawfully do: agree on a verdict or disagree on what the facts of the case may truly be.
There is nothing to disagree about on the law. The law is as I told you. If you have any disagreements about the law, I should clear them for you now. That should be my problem, not yours. If you disagree over what you believe the evidence showed, then only you can resolve that conflict, if it is to be resolved.

You must also remember that if the evidence in the case fails to establish guilt beyond a reasonable doubt as to any or all counts, the Defendant should have your unanimous verdict of Not Guilty as to that Count or Counts. If the evidence in the case establishes the guilt of the defendant beyond a reasonable doubt as to any or all counts, then you should enter a unanimous verdict of guilty as to that count or counts.
I have only one request of you. By law, I cannot demand this of you, but I want you to go back into the jury room. Then, taking turns, tell each of the other jurors about any weakness of your own position. You should not interrupt each other or comment on each other's views until each of you has had a chance to talk. After you have done that, if you simply cannot reach a unanimous verdict, then return to the courtroom and I will declare this case mistried and I will discharge you with my sincere appreciation for your services.
You may be as leisurely in your deliberations as the occasion may require and should take all the time which you feel is necessary.

sary to the due and orderly administration of justice, and review the challenge to the legal accuracy of the charge where, as here, the failure of the judge to follow the text of the requested instruction was, at the least, induced by the action of counsel...."

Here, West acquiesced in a trial strategy which he now regrets, yet "[w]e cannot permit an accused to elect to pursue one course at the trial and then, when that has proved to be unprofitable, to insist on appeal that the course which he rejected at trial be reopened to him." *Johnson,* 318 U.S. at 201, 63 S.Ct. at 555. At trial, West and his counsel had every opportunity to pursue any tactics they wished. Once a defendant selects a strategy, however, he may not hold the trial judge responsible for its failure. As the Supreme Court has also noted:

> Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system.

*Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976). We reject, therefore, West's assertion that the district court's jury instructions reflected an abuse of discretion.

West also asks that we review the court's procedure under the "plain error" standard of Rule 52(b) of the Federal Rules of Criminal Procedure. We will dispose of this claim briefly.

■ To plead entrapment successfully, a defendant must demonstrate the presence of two elements. The defendant has the initial burden and must make a *prima facie* showing of government inducement to commit the crime charged and the defendant's lack of predisposition to engage in criminal conduct. *Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). In order to meet its

burden, the defendant must come forward with more than a scintilla of evidence that the government's conduct created a substantial risk that a person, other than one ready to commit the offense, would in fact commit it. *United States v. Andrews,* 765 F.2d 1491, 1499 (11th Cir.1985), *cert. denied sub nom. Royster v. United States,* 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986).

■ We note that West did not testify or present any affirmative evidence in support of his claim of entrapment. We also note, however, that "[a]s a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Matthews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988). Nonetheless, our review of the evidence in this matter convinces us that the district court properly declined to give the jury the entrapment instruction.

■ The only evidence of government inducement to which West points is his assertion that Kimball may have been the first to raise the subject, and an unsupported contention to this court that Kimball "goaded" West. To raise entrapment a defendant must prove more than that the government first solicited him or merely provided the opportunity for the crime. *See United States v. Hill,* 626 F.2d 1301, 1304 (5th Cir.1980)[4], ("[I]nducement" represents more than mere suggestion, solicitation, or initiation of contact and, in fact, embodies an element of persuasion or mild coercion functionally equivalent to that denoted in the *Pierce* formulation (conduct such as would "create a substantial risk that the offense would be committed by a person other than one ready to commit it")).

At trial, the evidence against West was very strong. In each of the tape recorded conversations between West and Kimball that the jury heard, West initiated the sub-

---

**4.** The Eleventh Circuit in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

ject of the hitman. When Botyos first contacted West, he immediately agreed to meet with him, and furnished him his office number. At the videotaped meeting with Botyos, West discussed the planned murder and negotiated a fee. West also described himself as a "cold and calculating" person, and added that he was certain that he could handle the pressure from police. The testimony of both Kimball and Ron Getlin further strengthened the evidence against West. The evidence showed that the government merely provided an opportunity for West to exercise his interest in having Coughlin murdered; no instruction on entrapment was necessary.

### F. THE SENTENCING GUIDELINES

■ West challenges the validity of the sentencing guidelines under which the district court sentenced him. His specific contention is that while the enabling statute in the U.S.Code, 18 U.S.C. § 3583(a) permits an *optional* term of supervised release[5], the sentencing guidelines require a *mandatory* term[6]; thus, he argues, the guidelines conflict with the statute and are invalid.

Our review of the Code shows ample authorization for the mandatory tone of the sentencing guidelines. 28 U.S.C. § 994(a) requires the Commission to promulgate guidelines; it also gives the Commission complete discretion to determine "whether a sentence to a term of imprisonment should include a requirement that the defendant be placed on a term of supervised release after imprisonment, and, if so, the appropriate length of such a term...." *See also United States v. Mendez*, 691 F.Supp. 656, 664 (S.D.N.Y.1988). The Act's legislative history states that this subsection *"requires* that the sentencing guidelines recommend whether a category of

defendant convicted of a particular offense who is sentenced to a term of imprisonment should be required to serve a term of supervised release, and if so, *what length of term is appropriate."* U.S.Code Cong. & Admin.News 1984, p. 3348. (emphasis supplied). Thus we hold that 28 U.S.C. § 994(a), provides sufficient authority for the guidelines' mandatory provisions for supervised release.

West next contends that neither the probation officer nor the sentencing judge considered the factors (found at 18 U.S.C. § 3553) that 18 U.S.C. § 3583(c) requires them to consider. He asserts that since neither the pre-sentence investigation nor the court's statements at his sentencing reflect the court's express consideration of these factors, the court failed to fulfill the duties that the statute demands.

We note first that nothing in the Sentencing Reform Act or the Federal Rules of Criminal Procedure requires the district court to cite on the record that it has explicitly considered each of the factors listed in 18 U.S.C. § 3553(a). The district court made every effort to comply with the sentencing statute and the guidelines; the sentencing hearing, in itself, lasted over three hours.

■ The sentencing judge elected not to depart in any fashion from the applicable guideline range. When the court mandates no departure, the sentencing judge need not offer further reasons justifying the sentence. As a general matter, we join the Fifth Circuit in "urg[ing] district courts to clarify their ultimate factual findings by more specific findings when possible." *United States v. Mejia–Orosco*, 867 F.2d 216, 221 (5th Cir.1989), *cert. denied,* — U.S. ——, 109 S.Ct. 3257, 106 L.Ed.2d 602

---

5. 18 U.S.C. § 3583(a) provides:
 The court, in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, *may* include a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment, except that the court *shall* include as a part of the sentence a requirement that the defendant be placed on a term of supervised release if such a term is required by statute. (emphasis supplied).

6. The relevant section of the sentencing guidelines provides:
 The court *shall* order a term of supervised release to follow imprisonment when a sentence of imprisonment of more than one year is imposed, or when required by statute.
 United States Sentencing Commission, *Guidelines Manual* § 5D3.1(a) (Jan. 1988). (emphasis supplied). (Under the current guidelines, this provision has become § 5D1.1(a)).

(1989). A judge *must* offer reasons, according to 18 U.S.C. § 3553(a), however, only when he departs from the guideline range.

■ In his final assault on the district court's procedure under the sentencing guidelines, West again contends that a particular guideline imposes a more stringent penalty than that authorized by the enabling statute. 18 U.S.C. § 3583(b)(3) authorizes a term of supervised release for Class C or Class D felonies of "not more than 3 years;" U.S.S.G. § 5D3.2(b)(2),[7] however, authorizes a supervised release term (under the relevant statute) of "at least two years but not more than three years for a defendant convicted of a Class C or Class D felony." West contends that the guidelines lack the authority to impose a minimum term of supervised release when the enabling statute, 18 U.S.C. § 3583(b)(2) only imposes a maximum term.

We do not agree. 18 U.S.C. § 3583(b)(2) does not prohibit the guidelines establishing a minimum term of supervised release, and, as the Supreme Court noted in *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 657, 102 L.Ed.2d 714 (1989), "... the Commission enjoys significant discretion in formulating guidelines." As a practical matter, moreover, we also note that the optional language of the guidelines permits the sentencing judge to make downward departures from their terms. We hold, therefore, that guideline § 5D3.2(b)(2) does not impermissibly extend the term of supervised release established in 18 U.S.C. § 3583(b)(2).

■ West's last challenge to his sentence involves the *length* of his term of supervised release. West argues that mandatory supervised release statutes, such as 21 U.S.C. § 841(a)(1)(A), provide that the period of supervised release shall be "in addition to" the period of imprisonment. Since 18 U.S.C. § 3583(a) states only that the term of supervised release shall be "included *as part of* the sentence," West argues that this term should not extend beyond the end of the term of actual im-

prisonment. (emphasis supplied). Instead, according to West, his term of supervised release should equal the period measured by the difference between his fifty-one month sentence and the date of his release from prison pursuant to 18 U.S.C. § 3624.

We find this argument ingenious but unconvincing. The Senate Committee Report on this provision of the Sentencing Reform Act clearly states that:

> Unlike current parole law, the question whether the defendant will be supervised following his term of imprisonment is dependant on whether the judge concludes that he needs supervision, rather than on the question whether a particular amount of his time of imprisonment remains. The term of supervised release would be *a separate part* of the defendant's sentence, rather than being the end of the term of imprisonment.... The length of the term of supervised release will be dependent on the needs of the defendant rather than, as in current law, on the almost sheer accident of the amount of time that happens to remain of the term of imprisonment when the defendant is released.

(Emphasis supplied). S.Rep. No. 98–225 at 123–124, *reprinted in* 1984 U.S.Code Cong. & Admin.News, pp. 3182, 3306–07. We conclude that Congress intended a defendant's term of supervised release to be "a separate part" of, or in addition to, his term of imprisonment.

## CONCLUSION

We conclude that the district court's exclusion of West's testimony regarding Kimball's telephone conversation was harmless error; the district court did not abuse its discretion by admitting the extrinsic evidence challenged by West. Moreover, the district judge properly denied West's motion for a mistrial.

We will not invalidate the district court's "modified, modified *Allen* charge." The district court's sentencing procedure was proper, given that its sentence did not depart from the guideline range, and we up-

---

7. Under the current guidelines, this provision has become U.S.S.G. § 5D1.2(b)(2).

hold the validity of the challenged guidelines.

The judgment of the district court is AFFIRMED.