[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12436

_____

D.C. Docket No. 5:12-cr-00286-SLB-RRA-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JERRY THOMAS DAVIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(March 5, 2015)

Before MARTIN, Circuit Judge, and RESTANI,* Judge, and HINKLE,** District
Judge.

HINKLE, District Judge:

_____

* Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by
designation.

** Honorable Robert L. Hinkle, United States District Judge for the Northern District of
Florida, sitting by designation.

This criminal case presents three issues.  First, does Federal Rule of Evidence 610, which excludes evidence of a witness's "religious beliefs or opinions . . . to attack or support the witness's credibility," bar evidence that a witness's job is city and police-department chaplain, even when neither side argues that this affects credibility?  Second, must a court give a special jury instruction on the credibility of a law enforcement officer and the defendant's right to attack an officer's credibility?  Third, may a court that has already given one modified <u>Allen</u> charge tell a deadlocked jury to keep deliberating—with a reasonable suggestion for how to do it—while also telling the jurors they will be released if they are unable to agree within a short additional period of deliberations?  We resolve all three issues for the government and affirm the defendant's conviction.

I

A jury convicted the defendant Jerry Thomas Davis of possessing an unregistered short-barreled shotgun in violation of 26 U.S.C. § 5861(d).  He now appeals.

The background is this.  Hanceville is a small city in Alabama.  Its police department received a 911 report that Mr. Davis pointed a sawed-off shotgun at another person.  The report gave a residential address.

Officers Anthony Childress and Jady Pipes separately traveled to the address.  They were on the lookout for a red Pontiac Grand Am.  Mr. Pipes saw a

red Grand Am drive down the street but turn around in a driveway just before reaching the address at issue.  Mr. Pipes saw the driver of the Grand Am throw something out the driver's window, over the car, into a yard.  The Grand Am sped away, running stop signs.  Mr. Pipes gave chase with lights and sirens activated. He eventually succeeded in stopping the Grand Am about a mile away.  Mr. Davis was the Grand Am's driver and sole occupant.

When Mr. Childress arrived and went forward with the arrest, Mr. Pipes returned to the yard to look for the object thrown from the Grand Am.  He eventually found the short-barreled shotgun that led to Mr. Davis's conviction.

## II

Mr. Pipes was a sworn officer who routinely performed some of the same duties as other Hanceville officers.  But Mr. Pipes held the position of "chaplain," not only with the police department but also with the city itself.  Before trial, Mr. Davis moved to exclude testimony that Mr. Pipes was the "chaplain," to bar the government from referring to Mr. Pipes as "chaplain," and to prevent Mr. Pipes from appearing with these parts of his official uniform: a large, plainly visible cross on his hat and much smaller crosses on his badge and lapel.

Mr. Davis based his motion on Rule 610.  Mr. Davis did not challenge the city's decision to have a chaplain who wears a cross while serving as a law enforcement officer, and the issue is not before us.

3

The court ruled that Mr. Pipes could testify to his title and that the government could refer to him that way.  The court ruled that Mr. Pipes could not wear the large cross but could wear the other crosses, which were too small to be seen or recognized from the jury box.

The trial proceeded accordingly.  Mr. Pipes was the government's first and most important witness.  He was the only person who saw an object thrown from the car, so the case turned largely on his credibility.

On appeal, Mr. Davis asserts that allowing evidence that Mr. Pipes was a "chaplain"—and allowing the government to refer to him that way—violated Rule 610.  Mr. Davis has abandoned any complaint about the crosses.

A

The government says Mr. Davis waived the "chaplain" objection by failing to assert the objection contemporaneously during the trial.  That is plainly wrong. Since 2000, Federal Rule of Evidence 103(b) has provided: "Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal."  The government's reliance on older cases—cases of the kind that prompted the 2000 amendment—is misplaced.

Mr. Davis properly presented the "chaplain" issue in advance.  The court ruled definitively on the issue.  Mr. Davis's objection is fully preserved.  See, e.g.,

Tampa Bay Water v. HDR Eng'g, Inc., 731 F.3d 1171, 1178 (11th Cir. 2013) ("However, under the Federal Rules of Evidence, it is no longer necessary for a party to renew an objection to evidence when the district court has definitively ruled on the party's motion in limine."); Proctor v. Fluor Enters., Inc., 494 F.3d 1337, 1349-50 (11th Cir. 2007).

B

Rule 610 is entitled "Religious Beliefs or Opinions."  The rule provides in full: "Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility."

By its terms, the rule excludes evidence only when two conditions are both satisfied.  First, the evidence must be evidence of a witness's "religious beliefs or opinions."  Second, the evidence must be offered "to attack or support the witness's credibility."  Evidence of religious beliefs or opinions may be admitted for another purpose.

Mr. Davis falls short in both respects.

The government offered no evidence of Mr. Pipes's "religious beliefs or opinions."  In his argument to this court, Mr. Davis does not say—because on this record he cannot know—what religion Mr. Pipes adheres to.  Mr. Davis does not discuss—because on this record he cannot know—Mr. Pipes's religious beliefs.

5

Nobody said a word to the jury, in testimony or in argument, about Mr. Pipes's "religious beliefs or opinions."

All that was proved was that Mr. Pipes held the position of chaplain. Most chaplains, though not necessarily all, believe in a deity and adhere to an organized religion. But Mr. Pipes did not say whether this was true for him. And if he does adhere to an organized religion, Mr. Pipes did not say which one, or what he believes. (To be sure, while on duty Mr. Pipes wore a cross, a symbol associated with some religions but not others. The jury did not, however, learn of the cross.)

In trials across the country every day, countless witness examinations begin by having the witness tell the jury where the witness works. If the witness has a title, it almost always comes out. This background information is provided not "to attack or support the witness's credibility," but simply to introduce the witness. This probably happens in more witness examinations than not. Indeed, the defense began its cross-examination of Mr. Pipes with questions along this same line, pointing out that Mr. Pipes worked not only for the City of Hanceville but also part-time for another city's police department.

Rule 610 does not codify a bias against those who hold jobs that may be related to religion. So just as a witness who is a builder or grocer or pharmacist can testify to the job the witness holds, so can a chaplain. Or even a priest.

6

Mr. Davis asserts—probably correctly—that the government wished for the jury to consider Mr. Pipes's position in assessing his credibility.  But the government never said that.  And in any event, juries every day undoubtedly consider a witness's job in assessing the witness's testimony.  Considering a witness's job is not the same thing as considering the witness's "religious beliefs or opinions."  Nor is proving a witness's job the same as "attacking or supporting the witness's credibility," a phrase that means attacking or supporting the witness's "character for truthfulness."  See Fed. R. Evid. 608 advisory committee's note on 2003 amendments (noting that Rule 610 "use[s] the term 'credibility' when the intent of [that rule] is to regulate impeachment of a witness' character for truthfulness"); Glen Weissenberger & James J. Duane, Federal Rules of Evidence: Rules, Legislative History, Commentary, and Authority 391 (7th ed. 2011) (Rule 610 "is in harmony with prior federal practice, which has long forbidden inquiry into the religious beliefs of a witness for the purpose of impeaching his or her character for truthfulness.") (citing 4 Weinstein's Federal Evidence § 610.02).

In analyzing this issue, it bears noting that Rule 610 applies to defendants as well as the government.  If, instead of a police chaplain called by the government, the witness was an alibi witness called by the defendant, and the alibi witness was a priest, would we say the defendant could not ask the priest what he does for a living?

7

Similarly, Rule 610 applies in civil as well as criminal cases.  In an ordinary car-wreck case, if a witness was a priest, or a secretary at the church, would we keep this from the jury?  What would it tell the jury if every witness but these two—the priest and the secretary—disclosed their jobs?  Or would we say that, in a case with a priest and church secretary on the witness list, no witness's job could be proved?

Mr. Davis has cited no case, and we are aware of none, suggesting that just asking a witness's job violates Rule 610.  We also can find no case explicitly holding that asking a witness's job does not violate Rule 610.  We suspect the reason is that witnesses who hold jobs related to religion routinely disclose their jobs, just as other witnesses do, without objection and without controversy.

Thus, for example, in Galloway v. United States, 319 U.S. 372, 379-80 (1943), the Court described the testimony this way: "Lt. Col. (Chaplain) Mathews said he observed a Private Joseph Galloway, who was a prisoner for desertion and a patient in the mental ward at Fort MacArthur Station Hospital, California, during a six weeks period early in 1920.  The chaplain's testimony gives strong evidence the man he observed was insane."  The Federal Rules of Evidence were not in effect in 1943, but, as noted above, the common law included the same ban on using religious beliefs or opinions to attack or support a witness's credibility.  See also 5 Weinstein's Federal Evidence § 610 App. 101 ("The adoption of Rule 610

effected no change in federal practice.  No attempt, recorded in the reports, had been made to impeach by evidence of religious beliefs for many years before adoption.").  In <u>Galloway</u>, no issue was noted regarding disclosure of the chaplain's title.

In <u>Holsomback v. White</u>, 133 F.3d 1382, 1385 n.2 (11th Cir. 1998), we said, "Holsomback's trial counsel called a total of six witnesses in addition to Holsomback: Holsomback's mother, his sister, his brother, his niece, and two pastors of churches Holsomback attended. . . . Finally, the two pastors testified that Holsomback's reputation in the community for truth and veracity was good."  So far as the opinion indicates, nobody contended that it violated Rule 610 to disclose that the witnesses were pastors.

Other cases are similar, showing that witnesses with religious positions have routinely disclosed their positions, apparently without objection or controversy. <u>See</u> <u>United States v. Holloman</u>, Nos. 99-4391, 99-4392, 238 F.3d 416, 2000 U.S. App. LEXIS 33952, at *1 (4th Cir. Dec. 29, 2000) ("The sound quality was not good and a defense witness, a volunteer prison minister, testified that he did not recognize Holloman's voice on the tapes."); <u>United States v. Pasillas-Gaytan</u>, 192 F.3d 864, 866 (9th Cir. 1999) ("A minister testified that she had filled out part of the naturalization application for Gaytan, and that his English was very limited."); <u>United States v. Jeffries</u>, 854 F.2d 254, 256 (7th Cir. 1988) ("A minister testified

9

how the defendant had led a mission group to Canada. "); United States v. Polsinelli, 649 F.2d 793, 794 (10th Cir. 1981) ("Counsel for Polsinelli called three character witnesses, a Catholic priest, a long-time family friend, and Polsinelli's 86-year-old grandmother."); Payne v. United States, 546 F. Supp. 2d 1312, 1322 n.5 (M.D. Fla. 2008) ("David Wine, himself a pastor, testified that he got involved in the Faith Promises Program through his church and its missionary program because he thought the program was 'very spiritual' and he wanted to pool resources and draw from those resources to use for missionary work (CR Dkt. 838 at 60-64).").

That Rule 610 does not preclude disclosure of a witness's job does not mean that a district court is without tools to control improper use of this kind of evidence. Federal Rule of Evidence 403 allows a court to exclude evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." This is a far better tool for dealing with issues of this kind.

Thus, for example, Rule 403 would have allowed exclusion of this witness's title—on the ground that the limited probative value of identifying the witness as a chaplain rather than only as an officer was substantially outweighed by the danger of unfair prejudice—while allowing disclosure of a witness's job in other circumstances. If Rule 610 is held to apply to a witness's job, in contrast,

exclusion of the job will be mandatory; the rule does not allow the more nuanced analysis contemplated by Rule 403.

Here the district court easily could have concluded that Mr. Pipes's position as chaplain should be excluded under Rule 403. And under that rule or the court's inherent authority, the district court could have directed the government not to use "chaplain" in addressing Mr. Pipes. It would have been easy to substitute "officer."

But the district court addressed this at the outset of the trial. What seems clear in hindsight is rarely so clear from the beginning. In any event, a district court has broad discretion under Rule 403 and on matters of this kind. See, e.g., United States v. King, 713 F.2d 627, 631 (11th Cir. 1983). Mr. Davis did not cite Rule 403 as a basis for his "chaplain" objection and has not invoked Rule 403 on appeal. The district court did not abuse its broad discretion under that rule.

In sum, allowing evidence that Mr. Pipes held the title of "chaplain" did not violate Rule 610 and was not an abuse of discretion.

## III

The court gave jury instructions on witness credibility that were substantively identical to the Eleventh Circuit's standard credibility instructions. See Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 5 (2010). Mr. Davis did not object to these instructions and could not reasonably have done so.

11

Mr. Davis did, however, ask for an additional instruction specifically addressing credibility of a law enforcement officer. The proposed instruction included this provision: "[I]t is quite legitimate for the defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his or her testimony may be colored by a personal or professional interest in the outcome of the case." Some would view this as a request for the district court to put its thumb on the defendant's side of the scales.

A district court has broad discretion in choosing the language of jury instructions. See, e.g., Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1276 (11th Cir. 2008) (citing Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1543 (11th Cir. 1996)). Here the instructions given by the district court adequately addressed witness credibility; that is why instructions like these are the circuit's standard instructions. There was no need for a separate instruction on officer credibility; that is why the circuit has no standard instruction on officer credibility.

The standard instructions of course are not controlling. See, e.g., United States v. Dohan, 508 F.3d 989, 994 (11th Cir. 2007). But here the standard instructions support the conclusion we would reach independently: the district court's credibility instructions in this case were adequate, and nothing more was needed. Even more clearly, there was no need for an instruction framed in a manner that a juror might view as favoring one side over the other.

12

The district court was correct—and certainly did not abuse its discretion—in concluding that its instructions adequately covered this subject.

IV

The jury returned its verdict after deliberating for just over six hours. Asking a jury to deliberate that long is not unusual. Mr. Davis complains, though, that the jury twice said it was deadlocked and twice was told to carry on.

The Supreme Court held long ago that a trial court may instruct a deadlocked jury to keep deliberating. Allen v. United States, 164 U.S. 492, 501-02 (1896). The practice has been criticized, see, e.g., United States v. Rey, 811 F.2d 1453, 1459-60 (11th Cir. 1987), but the law of the circuit approves the practice, as Rey squarely held. A district court has broad discretion in this area but must not coerce any juror to give up an honest belief. See, e.g., United States v. Bush, 727 F.3d 1308, 1320 n.6 (11th Cir. 2013); Rey, 811 F.2d at 1459-60. Our opinions provide a nonexhaustive list of factors that may be considered in deciding whether an instruction is coercive. See, e.g., United States v. Jones, 518 F. App'x 741, 743 (11th Cir. 2013) (citing United States v. Woodard, 531 F.3d 1352, 1364 (11th Cir. 2008)).

Here the jury first reported it was deadlocked after about three hours. The court sent the jury home for the day—it was nearing 5:00—and gave the circuit's standard modified Allen charge the next morning. That instruction tracked almost

verbatim the instruction given in Rey. Included was the statement that "no juror is

expected to give up an honest belief about the weight and effect of the

evidence . . . ." And the instruction was carefully balanced between the

government and the defendant, including, in the defendant's favor, these

statements:

> [I]f a majority or even a smaller number of you are in favor of an acquittal, the rest of you should ask yourselves again and most thoughtfully whether you should accept the weight and sufficiency of the evidence that fails to convince your fellow jurors beyond a reasonable doubt.
>
> . . . You must also remember that if the evidence fails to establish guilt beyond a reasonable doubt, the defendant must have your unanimous verdict of not guilty.

Under Rey and other decisions, giving this modified Allen instruction was not

error. See, e.g., Bush, 727 F.3d at 1320.

After just another hour, the jury again reported it was deadlocked. The court

again sent the jury back to deliberate, this time with another instruction:

> First, I'm going to ask you to stay through lunch and continue deliberations based on these instructions that I gave you, which I'm sure you've looked at again. I have had jurors who have been deadlocked, and they have been able to reach a verdict after several more hours.
>
> I know that you all have worked hard. I know that you may feel, because you've reported to me again that you're deadlocked, that you feel that there's no way that it's going to work, that you all can reach a unanimous verdict, but I'm going to just ask that you continue to work . . . .

14

Let me say this: This is something that—this is another charge that I occasionally give, and I'm going to give it also, because I think this might be a way for you all to continue your deliberations. . . .

Ladies and gentlemen, I have one request.  I'm going to start looking at Mr. Denham [the foreperson], and I'm going to look at each of you.  By law I cannot demand this of you, but I want you to go back into the jury room.  Then, taking turns, tell each of the other jurors about any weaknesses of your own position.  You should not interrupt each other or comment on each other's views until each of you has had a chance to talk.  And I want you to continue your deliberations after each of the 12 of you have done that, given the weaknesses of your own position without interrupting each other going around and give the weaknesses of your own position.  And then after that, then continue your deliberations.

If after you do that and you all continue to talk and feel that you cannot reach a verdict, then <u>come back again, and I will discharge you with my sincere thanks for your hard work in this case</u>.

So with those last instructions, I'm going to ask that you continue deliberations. . . .  Thank you very much.

(Emphasis added.)  This acknowledge-your-weaknesses language closely tracked the instruction upheld in <u>United States v. West</u>, 898 F.2d 1493, 1500-01 & n.3 (11th Cir. 1990).

The jury resumed its deliberations.  Some 90 minutes later, just before the lunch break, the jury sent out a question that showed it was focused on the merits: "In the police report regarding Jerry Davis pointing a sawed-off shotgun, is it possible to say who made that report?"  The court sent the jury to lunch and consulted with the attorneys about the proper response to the question.  When the

15

jury returned from lunch, the court gave the response to the question that both sides agreed was proper. The court read the question back to the jury and said, "[T]he answer is no, it is not possible to say."

Roughly 40 minutes later, the jury announced it had reached a verdict.

Nothing about this chronology or the court's instructions suggests that the jury was coerced in any way. Some jurors deliberate for days before saying they are deadlocked. Others, like these, deliberate for only a few hours. Telling jurors who have deliberated for only a few hours to keep trying is not inherently coercive. And here, each instruction had elements that protected against coercion. The first instruction told jurors not to give up an honest belief. The second told jurors an end was in sight: if they stayed through lunch but could not agree, they would be discharged. The jurors stayed that long but did not ask to be discharged; instead, they asked a question on the merits, received an answer, and soon reached a verdict.

The chronology here is not precisely the same as in any of our prior cases. But the instructions were nearly identical to those given in West. West is different in only three respects, none of which carries the day for Mr. Davis.

First, in West, the jury said it was deadlocked just once; the court gave as a unit its entire Allen charge—that is, the same instructions that in our case the court split into two installments. But what counts is not the number of instructions but

16

the overall circumstances and risk of coercion.  We have never adopted a <u>per se</u> rule against successive <u>Allen</u> charges.  Other circuits have held there is <u>not</u> a <u>per se</u> rule.  <u>See, e.g.</u>, <u>United States v. Crispo</u>, 306 F.3d 71, 77 (2d Cir. 2002); <u>United States v. Ailsworth</u>, 138 F.3d 843, 851-52 (10th Cir. 1998); <u>United States v. Barone</u>, 114 F.3d 1284, 1304-05 (1st Cir. 1997); <u>United States v. Cropp</u>, 127 F.3d 354, 360 (4th Cir. 1997)<u>;</u> <u>United States v. Reed</u>, 686 F.2d 651, 652-53 (8th Cir. 1982); <u>see also</u> <u>United States v. Fossler</u>, 597 F.2d 478, 485 (5th Cir. 1979) (reversing a conviction in circumstances that, unlike here, showed coercion, but declining to adopt a <u>per se</u> rule against successive <u>Allen</u> charges).  <u>But see</u> <u>United States v. Seawell</u>, 550 F.2d 1159, 1163 (9th Cir. 1977) ("We conclude that as a sound rule of practice it is reversible error to repeat an <u>Allen</u> charge in a federal prosecution in this circuit after a jury has reported itself deadlocked and has not itself requested a repetition of the instruction.").

Second, in <u>West</u>, the jury deliberated much longer (11 hours over 3 days) before announcing it was deadlocked, and also deliberated much longer (most of 2 days) <u>after</u> the <u>Allen</u> charge.  The risk of coercion increases as deliberations run longer.

Third, and at least as importantly, in our case the court told the jury that if it worked through lunch (bringing the total deliberations to about 6 hours) and still

did not reach a verdict, the jury would be discharged.  When jurors know an end is in sight, the risk of coercion is diminished.

On balance, even though in our case the jury twice said it was deadlocked, the jury's 6 total hours of deliberations (with a guaranteed, not-far-off discharge point) presented no greater risk of coercion than the West jury's 4 days of deliberations (with no end in sight).  This is enough to show that under the law of the circuit, the instructions given here were within the district court's discretion.

In the larger debate over modified Allen charges, two other points deserve mention.

First, modified Allen charges sometimes help the defendant.  See, e.g., United States v. Cargo Servs. Stations, 657 F.2d 676, 684 (5th Cir. Unit B Sept. 1981) (noting, in an appeal by a convicted corporate defendant, that the individual defendants were acquitted after the court gave successive Allen charges).  The reported decisions almost all involve convictions not because the charges always help the government but because when they help the defendant—when the jury keeps deliberating and returns a not-guilty verdict—the government cannot appeal; the acquittal ends the case, and no opinion is written (unless, as in Cargo Services, another defendant is convicted and appeals).  Mr. Davis objected to the Allen charges here, but many defendants in other cases have asked that such a charge be given and that deliberations continue.  Acquittals have sometimes resulted.

18

Second, declaring a mistrial can impose a cost not just in time and resources but in the quality of justice.  Cross-examinations may be best when conducted just once, without a dress rehearsal.  Sometimes a second trial is better, but often it is not.  So it is best not to declare a mistrial too soon.  Knowing how soon is too soon is not always easy.  Have the jurors run the issues to ground, or are they bailing out early?  Are they still communicating, or are they so mad at one another that further progress is unlikely?  A district judge, watching the jurors file back into the courtroom and looking them in the eye, can make a better judgment on this than an appellate court reading the cold record.  We are rightly slow to second guess a district court's exercise of discretion on these issues.

In any event, under <u>Rey</u> and <u>West</u> and our other decisions, the court's charges here were not an abuse of discretion.

V

For these reasons, the judgment is affirmed.

19

MARTIN, Circuit Judge, concurring:

I agree that Mr. Davis's conviction should be affirmed.  I write separately to address Mr. Davis's argument that the District Court abused its discretion by admitting evidence of a witness's religious beliefs to support that witness's credibility.  See Fed. R. Evid. 610 ("Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility.").  As the government acknowledged before the District Court, it would have been "improper to make a show of [Mr. Pipes's] commission as a chaplain."  Resp. to Def.'s Mot. in Limine 2, Dec. 6, 2012, ECF No. 51.  I understand the majority's holding on this issue to be that the disclosure of Mr. Pipes's job title, without more, did not make such a show and therefore, did not violate Rule 610.