[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No.  14-14708
_____

D.C. Docket No. 3:09-cv-10727-WGY-HTS

PAULINE BURKHART,

Plaintiff - Appellee,

versus

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the Brown and Williamson Tobacco
Corporation and the American Tobacco Company,
PHILIP MORRIS USA, INC.,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(March 7, 2018)

Before TJOFLAT and HULL, Circuit Judges, and BARTLE,* District Judge.

TJOFLAT, Circuit Judge:

_____

* Honorable Harvey Bartle III, Senior United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

This appeal, brought by three tobacco companies ("Appellants"), challenges on multiple grounds the judgment entered against them and in favor of Pauline Burkhart for compensatory and punitive damages. The judgment was awarded after a bifurcated, ten-day trial in which the jury found in Burkhart's favor on her claims of negligence, strict liability, fraudulent concealment, and civil conspiracy. This case, which is one of thousands of *Engle* progeny lawsuits initiated by smokers in the state of Florida against this country's major tobacco companies, has remained pending on appeal for several years while awaiting resolution of other appeals in this Court and the Florida Supreme Court. With the benefit of those decisions, and after carefully reviewing the record and considering the parties' written and oral arguments, we affirm the District Court's judgment in full.

I.

A. *The* Engle *Litigation*

This case has its genesis in 1994, when six plaintiffs suffering from lung diseases sued this country's major cigarette manufacturers for strict liability, negligence, breach of express warranty, breach of implied warranty, fraud, conspiracy to commit fraud, and intentional infliction of emotional distress. *Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278, 1281 (11th Cir. 2013). The plaintiffs brought their suit as a class action on behalf of all Florida citizens and residents "who have suffered, presently suffer or have died from diseases and medical conditions caused by the addiction to cigarettes that contain nicotine," as well as their survivors. *R.J.*

2

*Reynolds Tobacco Co. v. Engle*, 672 So. 2d 39, 40 (Fla. Dist. Ct. App. 1996).  The

Florida trial court certified the class and divided the case up into three phases.  In the

first phase, after a year-long trial, a jury decided "common issues relating exclusively

to defendants' conduct and the general health effects of smoking," such as causation

and the class's entitlement to punitive damages.  *Philip Morris USA, Inc. v. Douglas*,

110 So. 3d 419, 428 (Fla. 2013) (quoting *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246,

1277 (Fla. 2006) (per curiam)).  After deliberations, the jury answered nine questions

on the jury form, which was agreed upon by the class and the tobacco companies.

The first two answers resolved questions of causation: "1 (that smoking cigarettes

causes [20 specific diseases])" and "2 (that nicotine in cigarettes is addictive)."

*Engle*, 945 So. 2d at 1277.  In addition to these findings, the jury found the following

with respect to the tobacco companies' conduct:

> 3 (that the defendants placed cigarettes on the market that were defective
> and unreasonably dangerous), 4(a) (that the defendants concealed or
> omitted material information not otherwise known or available knowing
> that the material was false or misleading or failed to disclose a material
> fact concerning the health effects or addictive nature of smoking
> cigarettes or both), 5(a) (that the defendants agreed to conceal or omit
> information regarding the health effects of cigarettes or their addictive
> nature with the intention that smokers and the public would rely on this
> information to their detriment), 6 (that all of the defendants sold or
> supplied cigarettes that were defective), 7 (that all of the defendants sold
> or supplied cigarettes that, at the time of sale or supply, did not conform
> to representations of fact made by said defendants), and 8 (that all of the
> defendants were negligent).

*Id.*  The jury further "made nonspecific findings in favor of the plaintiffs on Questions

4[b] (fraud and misrepresentation) and 9 (intentional infliction of emotional distress)."

3

*Id.* at 1255.  Finally, the jury found that the tobacco companies' conduct entitled the class to punitive damages.  *Id.* at 1262.

In the second phase, the jury concluded that the tobacco companies were liable to three of the class's representatives and accordingly awarded compensatory damages in the amount of $12.7 million.  *Walker*, 734 F.3d at 1282.  The jury also set a $145 billion punitive damages award on behalf of the entire class.  *Id.*

The third phase would have asked new juries to "decide specific causation and damages for the remaining class members in Phase III."  *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1175 (11th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 636 (2018).  However, before Phase III began, the tobacco companies appealed the judgments in both of the first two phases of the trial.  *Id.* at 1178.  The Florida Supreme Court affirmed in part and reversed in part.  *Engle*, 945 So. 2d at 1254.  The Court held that class certification was impossible with respect to the upcoming third phase of the trial, which involved questions of liability to individual plaintiffs, "because individualized issues such as legal causation, comparative fault, and damages predominate."  *Id.* at 1268.  However, the Court "retained" the jury's Phase I findings as to the tobacco companies' conduct "other than those on the fraud and intentional infliction of emotional distress claims, which involved highly individualized determinations, and the finding on entitlement to punitive damages questions, which was premature."  *Graham*, 857 F.3d at 1178 (quotations and alterations omitted) (quoting *Engle*, 945 So. 2d at 1269).  Hence the Court explained

4

that going forward, individual plaintiffs could pursue "individual damages actions" on their own. *Engle*, 945 So. 2d at 1269. When they do so, the Court explained, those "retained findings" from the first two phases of the trial "will have res judicata effect in those trials." *Id.* The Court vacated accordingly the class-wide punitive damages finding the jury awarded in Phase II. *Id.* at 1276.

Thousands of individual lawsuits followed. These suits—known commonly as "*Engle* progeny" suits—presented the Florida Supreme Court with a new question arising from its decision to give preclusive effect to the *Engle* jury's Phase I findings. This question concerned the "extent to which the smokers could rely on the approved findings from Phase I to establish certain elements of their claims." *Graham*, 857 F.3d at 1178. The Court resolved this question in *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419 (Fla. 2013). It held that the Phase I findings were "common to all class members and will not change from case to case"; hence, those findings were sufficient to "conclusively establish" the conduct elements of the plaintiffs' individual claims, to the extent those findings matched the elements required to establish the plaintiffs' tort claims. *Id.* at 428–30. The Court also held that giving preclusive effect to the Phase I findings did not violate the tobacco companies' due process rights under the federal Constitution. *Id.* at 430.

In *Walker v. R.J. Reynolds Tobacco Co.*, we too held that giving preclusive effect to the jury's findings in Phase I of *Engle* did not run afoul of the Due Process Clause. 734 F.3d at 1290. We explained that the Constitution requires us to give full

5

faith and credit to the Florida Supreme Court's decisions in *Engle*, as interpreted by *Douglas*, unless doing so would violate the tobacco companies' due process rights. *Id.* at 1287. We concluded that giving preclusive effect to the *Engle* jury's Phase I findings does not so deprive the tobacco companies of their right to contest their liability that it violates their constitutional right to due process. *Id.* at 1290. We reaffirmed this conclusion en banc in *Graham v. R.J. Reynolds Tobacco Co.* with respect to the negligence and strict-liability claims brought by the plaintiff in that case.[1] 857 F.3d at 1174.

## B. *This Case*

In the instant case, an *Engle* progeny suit, Pauline Burkhart sued R.J. Reynolds, Philip Morris, and Lorillard for negligence, strict products liability, fraudulent concealment, and conspiracy to fraudulently conceal. Burkhart, who began smoking in the 1950s and continued to do so until the 1990s, alleged that smoking caused her chronic obstructive pulmonary disease (COPD). She sought compensatory and punitive damages.

After extensive discovery and pretrial motions, the trial began on May 5, 2014. The District Court divided the trial into two phases. In the first phase, the Court asked the jury to consider whether Appellants were liable to Burkhart for compensatory and punitive damages, to determine whether Burkhart was contributorily negligent, and, if

---

[1] We did not, however, decide whether giving preclusive effect to *Engle* progeny plaintiffs' fraudulent concealment and conspiracy claims violates due process, because the jury in *Graham* found for the plaintiff on her negligence and strict-liability claims only. 857 F.3d at 1180.

so, to apportion fault among Burkhart and the three tobacco companies.  The Court also instructed the jury to establish a compensatory damages award if it did find Appellants were liable to Burkhart, and that the Court would thereafter apportion and reduce the award based on the jury's comparative-fault finding.  The Court instructed the jury to give preclusive effect to the *Engle* jury's findings as to Appellants' conduct for purposes of establishing the conduct elements of Burkhart's negligence, strict-liability, and intentional-tort claims.  In the second phase, the existence of which depended upon the jury's finding of liability for punitive damages in the first phase, the Court instructed the jury to determine the proper punitive damages award.

Two days into the trial's first phase, Burkhart suffered a medical incident in the presence of the jury and was taken to the hospital.  *See infra* p. 15–17.  Burkhart recovered, and the trial continued after the District Court questioned the jurors individually about the incident's effects on their impartiality and thereafter denied Appellants' motion for a mistrial.

The first phase of the trial lasted eight days.  The District Court then sent the jury to deliberate on the question of Appellants' liability to Burkhart.  The jury instructions stated that the jury must treat as established that Appellants were negligent in bringing their products to the market, that the products were unreasonably dangerous, that Appellants concealed information about the risks of smoking that was not otherwise available to the public, and that they conspired amongst themselves to do so.  The instructions did, however, explain to the jury that it must determine

7

whether (1) Burkhart was a member of the *Engle* class; (2) whether she filed her claim within the applicable limitations period; (3) for purposes of her negligence and strict-liability claims, whether her smoking addiction caused her COPD; (4) for purposes of her fraudulent concealment and conspiracy claims, whether she relied on Appellants' concealment in continuing to smoke; and (5) for purposes of establishing Appellants' liability for punitive damages, whether Burkhart proved by clear and convincing evidence that Appellants' concealed information about the risks of smoking with knowledge of the wrongfulness of their conduct and the risks such concealment presented to the public.

The jury returned its verdict in favor of Burkhart on all of her claims. It found Appellants liable to Burkhart for compensatory damages and that Appellants' intentional conduct met the statutory standard to justify an award of punitive damages. The jury assessed Burkhart's compensatory damages at $5 million, and found that R.J. Reynolds' conduct caused twenty-five percent of the damages, Philip Morris' fifteen percent, and Lorillard's ten percent.

Next, the trial proceeded to its second phase, which was conducted solely for the purpose of fixing a punitive damages amount. After less than two hours of deliberating, the jury sent the Court a note saying that it could not "come to a unanimous decision." Appellants asked the Court to deliver an *Allen* charge to the jury, but the Court refused to do so at that point and instead delivered a written response instructing the jurors to continue deliberating and encouraging them to "re-

8

examine" their positions if they were to "become convinced" their positions were wrong. About forty minutes later, the jury sent a second note saying that it still could not reach a unanimous decision "without giving up honest beliefs." The Court then summoned the jury, delivered this Circuit's pattern *Allen* charge,[2] and sent the jury back to deliberations. Fifty minutes later, the jury returned a unanimous verdict awarding punitive damages as follows: $1,250,000 against R.J. Reynolds, $750,000 against Philip Morris, and $500,000 against Lorillard.

After trial concluded and the District Court issued its judgment, Appellants moved for judgment as a matter of law and a new trial. The District Court denied those motions. Appellants timely appealed.[3]

## II.

Appellants challenge the trial outcome on numerous grounds. Because many of those grounds rely on conduct by the District Court and the litigants that occurred at trial, we begin each subsection below with a recitation of the pertinent facts giving rise to the claim at issue.

### A. *Statute of Limitations Instructional Error*

---

[2] *See* 22A C.J.S. *Criminal Procedure and Rights of Accused* § 1931 (2017) ("An *Allen* charge is a supplemental instruction that advises deadlocked jurors to reconsider their positions and to give deference to each other's views with a disposition to be convinced of each other's argument. This is the defining characteristic of the charge. It is designed to encourage a divided jury to agree on a verdict and avoid a mistrial, while stating the need for unanimity in the jury's decision on the verdict." (footnotes omitted)).

[3] During the pendency of this appeal, R.J. Reynolds replaced Lorillard as successor by merger.

Appellants first argue that the District Court's jury instruction on the applicable statute of limitations misstated Florida law and warrants a retrial. COPD, like other smoking-related lung diseases, is a type of "creeping disease," a disease that worsens progressively over a relatively long period of time. Florida's statute of limitations is clear with regard to products-liability actions involving creeping diseases: it says the limitations period begins "only when the accumulated effects of the deleterious substance manifest themselves to the claimant, in a way which supplies some evidence of causal relationship to the manufactured product." *Carter v. Brown & Williamson Tobacco Corp.*, 778 So. 2d 932, 936 (Fla. 2000) (internal quotation marks and alterations omitted). It is the jury's responsibility to sort out when this first took place. "[T]he question of when the statute of limitations begins to run" in a personal-injury case involving a creeping disease "is generally treated as a fact question for a jury to resolve." *Id.* at 937 (internal quotation marks and alterations omitted).

In this case, then, the operative issue under Florida law was when the accumulated effects of Burkhart's COPD reached the point where she knew or should have known that there was a causal relationship between her smoking and her COPD. Indeed, the parties agreed on language to this effect before the Court changed it. Both parties' proposed instructions contained language stating that Burkhart's suit was barred if she "knew, or by the exercise of reasonable care should have known, before May 5, 1990, that she had COPD and that there was a reasonable possibility that her COPD was caused by *cigarette smoking*." (Emphasis added).

10

However, the District Court, believing this agreed-upon instruction misstated the law, changed the instruction and instead told the jury:

> The verdict form will ask you whether the Plaintiff knew, or in the exercise of reasonable care should have known, before May 5, 1990, that she was *addicted* to cigarettes, that she had COPD, and that her *addiction* would be causative of her COPD.

(Emphasis added).  Appellants argue that this instruction was unfounded under Florida law and prejudicial to their case.  They say the instruction misguided the jury: "Questions of whether Mrs. Burkhart was addicted, whether the addiction caused her COPD, and when she knew that it might have done so have no bearing on the proper limitations inquiry."  This, Appellants say, prejudiced them.  The statute of limitations is an affirmative defense in Florida; hence, the burden fell on Appellants to establish that the limitations period had lapsed when Burkhart brought suit.  In their view, "requiring [Appellants] to prove when a lay plaintiff knew she suffered an injury caused by *addiction* was a considerable burden—and far more onerous than simply requiring them to prove that she knew she suffered a disease possibly caused by smoking."  They argue that they "put forth extensive evidence that Mrs. Burkhart's COPD had manifested well before 1990 and that she attributed multiple COPD symptoms to her smoking."  Thus, the District Court's instructional error in effect negated this evidence.

We conclude that the District Court's instruction was erroneous yet harmless. The evidence in the trial record established indisputably that Burkhart was diagnosed

11

with COPD after May 5, 1990.  Although Appellants say they "put forth extensive evidence that Mrs. Burkhart's COPD had manifested well before 1990 and that she attributed multiple COPD symptoms to her smoking," the evidence they cite establishes only that she experienced general smoking-related symptoms, not symptoms that would put her on notice that she suffered from COPD.  Appellants cite testimony that Burkhart "had a really good smoker's cough" in the 1970s, that by the 1980s "her cough was causing chest tightness and taking her breath away" and she "began to experience shortness of breath when doing yard work, walking up stairs, and visiting higher altitudes," and that she "repeatedly suffered from bronchitis" during those periods.

Under Florida law, standing alone, these symptoms could not have given Burkhart notice that she had COPD, let alone that her claim against the tobacco companies was legally actionable.  As the Florida Third District Court of Appeal observed in a similar tobacco case while ruling on the admissibility of expert testimony about the timeliness of a doctor's diagnosis of COPD in the plaintiff,

> [M]any symptoms or effects that might later develop to become a compensable injury attributable to smoking—shortness of breath, or persistent coughing, for example—do not in isolation provide a sufficient legal basis for initiating a lawsuit against a tobacco company. Rather, the "manifestations" that are pertinent are symptoms or effects that actually disclose that the prospective claimant is suffering from a disease or medical condition caused by tobacco use, and which are thus sufficient to assert a cause of action against the responsible manufacturer(s).  In the case at hand, Ms. Frazier could not have filed a non-frivolous lawsuit against the appellees in 1986 on a theory that her symptoms and pneumonia were compensable results of her addiction to

12

tobacco, nor could she have filed such a lawsuit in 1987 for "pneumonia and/or bronchitis." It was not until February 1991 that a set of tests and a referral adduced competent evidence that COPD/emphysema was a likely suspect.

*Frazier v. Philip Morris USA Inc.*, 89 So. 3d 937, 945 (Fla. Dist. Ct. App. 2012),

*approved sub nom. Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681 (Fla. 2015).

The Court further explained,

> The issue was not whether [the plaintiff] "had" the creeping, stealthy disease of COPD/emphysema before May 5, 1990; the issue was whether she knew, or reasonably should have known, enough to permit her to commence a non-frivolous tort lawsuit against the appellees on the basis of those physical, observable, patent symptoms and effects ("manifestations") before that date.

*Id.* at 946.

This analysis is true in the instant case as well. That Burkhart had a smoker's cough, shortness of breath, and intermittent bronchitis established only that she suffered from respiratory symptoms that are ubiquitous among smokers, the majority of which never develop COPD. Indeed, Appellants' own expert witness testified that smoker's cough is frequent in smokers, and that most smokers who experience it do not have or will not get COPD.

In sum, it is undisputed that Burkhart was diagnosed with COPD well after May 5, 1990. The evidence in the record would not allow a reasonable factfinder to find that she knew or should have known that she had a smoking-related disease prior to her COPD diagnosis. Thus, the District Court's instructional error was harmless, because it could have prejudiced Appellants only if the evidence presented would

13

have supported the finding that Burkhart knew or should have known that she had a smoking-related lung disease prior to May 5, 1990.

## B. *Burkhart's In-Court Medical Emergency*

Next, Appellants argue that Burkhart's medical event in the courtroom infected the jury with prejudice. They contend the District Court should have accordingly declared a mistrial.

Three days into the trial, about twenty minutes after the day's proceedings began, Burkhart suffered a medical incident. The trial record indicates she stated, "I think I'm having a stroke." Exactly what happened immediately afterward is unclear from the record and subject to differing accounts: Appellants allege Burkhart "continued crying out in pain for 20 or 30 seconds or perhaps a minute" in the presence of the jury, while Burkhart alleges the District Court "immediately excused the jurors."

In any event, after the District Court dismissed the jury, Burkhart's counsel explained to the Court that the incident might have been related to a fall Burkhart suffered earlier that morning, or that it might have stemmed from Burkhart's reaction to anxiety and stress. Appellants then moved for a mistrial on the basis that the incident would have a "massive emotional effect" on the jury that would unduly prejudice Appellants. After hearing arguments from both sides, the District Court brought the jurors in and asked them one-by-one if they would be able to put the

14

incident behind them in deciding the case and/or assessing damages. The Court asked each of the eight jurors the same two questions:

> [First], "do you believe that observing that incident will cause you to have sympathy with regard to Mrs. Burkhart's case to the point where it influences your decision on the facts and the law? And, second, whether or not in spite of that sympathy, which is natural—nobody should feel embarrassed by having such sympathy—whether or not you can make your decision strictly on the evidence presented to you, of which this incident was not a part?"

All of the jurors assured the Court that they would not be influenced by the incident, and that they could render their decision strictly on the basis of the evidence. None was equivocal. One juror stated, "I do feel sympathetic, but not that it would impede my judgment in any way." Another stated, "I can't say I feel any more sympathetic today than yesterday. I understand that she's a sick person or she wouldn't be in the lawsuit." Still another said, "I'm sympathetic with her condition and the incident that happened, but it won't affect my decision in any way." When asked whether he could "honor [his] oath," another juror answered, "Unequivocally." In addition, the District Court remarked that it "fully agree[d]" with the observation of Burkhart's counsel that the jurors "both with their body language and their tone of voice reflected their willingness to abide by the oath and to ignore the incident."

Despite these assurances, Appellants maintain that the jury was irreparably prejudiced by the event. They contend that "Mrs. Burkhart's in-court medical emergency created just the sort of incurable prejudice that requires a new trial,"

15

particularly because "it pertained directly to her claim for non-economic damages" like pain and suffering and mental anguish.

We review a District Court's ruling on a motion to grant a mistrial based on unexpected events at trial for abuse of discretion. *Messer v. Kemp*, 760 F.2d 1080, 1087 (11th Cir. 1985). Such situations warrant considerable deference to the District Court's judgment: "Because the trial judge is in the best position to evaluate the prejudicial effect of a spectator's outburst, the decision on whether to grant a mistrial lies within his sound discretion." *Id.* Oftentimes, the District Court may cure the error by instructing the jury to disregard the potentially prejudicial incident. *See Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1302–03 (11th Cir. 2001) (holding the district court did not abuse its discretion in denying a mistrial after unexpected "emotional outbursts from [the plaintiff] and another witness," when "[t]he court questioned each of the prospective jurors about what they had witnessed and what effect it might have on their partiality" and "[e]ach juror ultimately selected to serve on the jury stated that he or she could ignore the incident and decide the case based on the evidence").

Here, we conclude that the District Court did not abuse its discretion in denying Appellants' motion for a mistrial. Shortly after Burkhart's medical incident, the District Court carefully instructed the jury to disregard the episode and consider only the evidence presented in the case when reaching its verdict. The Court also questioned the jurors individually as to whether they would be able to keep any

16

sympathy for Burkhart engendered by the incident from influencing their deliberations. The jurors responded unequivocally that they would be able to do so. We have no reason to doubt them under the circumstances of this case. *See Raulerson v. Wainwright*, 753 F.2d 869, 876 (11th Cir. 1985) (per curiam) ("Jurors are presumed to follow the law as they are instructed."). We acknowledge that some events could be so incurably prejudicial that no instruction by the District Court could possibly remedy them. But based upon the jurors' unanimous and unequivocal responses and our deference to the District Court's sound discretion as a first-hand witness to the events in question, we are not persuaded that Burkhart's brief, isolated medical incident was such an event. We thus find no abuse of discretion.

## C. *Punitive Damages Issues*

Appellants challenge two aspects of the District Court's handling of the punitive damages phase of the trial. First, they argue the District Court "improperly prevented Defendants from opposing Mrs. Burkhart's request for punitive damages— even going so far as striking portions of the summation of Defendants' closing argument." Second, they contend the District Court coerced the deadlocked jury into reaching a unanimous verdict as to the punitive damages amount. We address each argument in turn.

### 1. The District Court's Conduct During Appellants' Closing Arguments

During Appellants' closing remarks, Burkhart's counsel twice objected to portions of their arguments concerned with the extent of Appellants' wrongdoing in

17

regards to the concealment and conspiracy torts.  The District Court sustained Burkhart's objections and instructed the jury each time that Appellants could not re-litigate the *Engle* jury's findings.  The first exchange occurred as follows:

> [Appellant R.J. Reynolds' counsel] MR. BELASIC: Now, Mr. Heimann says, well, you know, they kept the dangers secret so she gets extra money.  You know, he didn't mention any figure, and so we don't know, but what we do know is that *the information on the dangers of smoking weren't a secret*.  What they're actually saying is the tobacco companies didn't agree at a certain moment in time.  *We know they weren't secret*.
>
> I mean, we had this battle, who could put up the most evidence of historical knowledge and information?  And I won't belabor this.  But one of the things is we ran out of room on the board because it only went back to the 1940s.
>
> And the Florida Department of Health was saying 100 years ago that you could call nicotine addictive.  As far back as the 1920s—
>
> [Burkhart's counsel] MR. HEIMANN: I'm going to object.  This is challenging the *Engle* findings.  The *Engle* findings are they concealed information that wasn't known or knowable.  That's the finding.  He can't challenge that now.
>
> THE COURT: He can.  I'll just simply partially sustain.  But I'll have to overrule the objection as to his argument.
>
> He has the right to argue that punitive damages are not warranted because there's no need to deter or punish the conduct.
>
> MR. BELASIC: And, ladies and gentlemen, if you look in your instructions, you will see a specific written instruction from Judge Jones that says punitive damages cannot be based on the *Engle* findings.
>
> This is a question of Mrs. Burkhart.
>
> THE COURT: Solely on the *Engle* findings.  It's not enough to find warranted damages, punitive damages solely based upon application of the *Engle* finding.

18

(Emphasis added).  Despite the District Court's explanation, for the next several minutes (comprising two pages of the trial transcript), Mr. Belasic continued to argue that Appellants never concealed information about the health risks of smoking.

Thereafter, the Court again interjected:

> I think I have to re-emphasize, he cannot challenge the *Engle* findings. He cannot do that, say the *Engle* findings are not true in this case.  Can't do that.  The *Engle* findings were to the effect that there was fraud and that there was negligence.
>
> What he can do, however, is to say that in this case, punitive damages are not warranted under the standard I've given you in the legal instructions.
>
> So just that caution.  I'm not going to stop his argument here.  I just remind you, as a matter of law, he cannot challenge the *Engle* findings.

Within seconds, Mr. Belasic again turned to contest whether Appellants committed concealment:

> MR. BELASIC: . . . . So let's talk about *whether or not it was concealed* and what the experts said.
>
> We know this is the evidence.
>
> MR. HEIMANN: Objection.
>
> THE COURT: I'm going to sustain the objection, sir.  You cannot challenge the *Engle* findings that there was misstatement or not misstatement.
>
> MR. BELASIC: All right.  May I present the evidence that Dr. Burns presented?
>
> THE COURT: No.

(Emphasis added).  Later, Mr. Belasic yet again returned to the issue of whether

Appellants committed fraud, to which the Court responded emphatically:

> MR. BELASIC: . . . . 1990, when they observed smokers of filtered cigarettes, they find a lower risk of lung cancer.
> *How is that fraud*?  How did they show—does this make any sense?  Would the companies want to kill their own customers?  Would the companies *engage in wrongdoing* if they're going to spend all this money to make a safer cigarette that the government tries to shut down?  Would the companies be *engaged in wrongdoing* if they're working for ten years on published safer cigarette research, and the tobacco companies are the ones that are doing it, and the government shuts it down?
>
> MR. HEIMANN: Not really.  There's no evidence of this.  This is—he is coming up with—
>
> THE COURT: I have to sustain it.  I'm sorry.
>
> The standard I've given you under the legal instructions, which I think counsel is trying to change, is punitive damages.  This is on instruction number 17.
>
> Punitive damages are warranted if you find the plaintiff has proved by clear and convincing evidence that the defendant had actual knowledge of the wrongfulness of its conduct.
>
> I remind you here that wrongfulness of its conduct has already been determined by the *Engle* jury.  After listening to more than a year's worth of evidence, I'm not putting you through that burden.
>
> The *Engle* jury has already decided that, including the withholding of information about the effectiveness, according to their own research, of filters and/or perforated filters and/or menthol.
>
> The *Engle* jury already decided the wrongfulness.  To the extent he's arguing that it was not wrongful conduct, he can't do that.  I'm sorry.
>
> The burden here is on the plaintiff and the issue here for you to decide on punitive damages is whether they've proved by clear and convincing

evidence that the defendant had actual knowledge of the wrongfulness, the defendant had actual knowledge of the wrongfulness. The *Engle* jury has already said it was wrongful.

The question is whether they had actual knowledge of the wrongfulness and that there was a high probability of injury or damage and despite that knowledge intentionally pursued that course of conduct resulting in the plaintiff's injuries. That's the issue.

Were they aware of the wrongfulness, not whether the wrongfulness occurred and, therefore, I have to strike those portions where he's simply arguing there was no wrongful conduct. The *Engle* jury has already decided that for us.

But the plaintiff's burden is actual knowledge of the wrongfulness and despite high probability of injury and despite that knowledge pursued the course resulting in the plaintiff's injuries. That's the standard. I have to remind the jury of that.

Appellants take issue with these interjections. They contend that the District Court's interruptions "reflect[ed] a fundamental misunderstanding of the role of the *Engle* findings" and "improperly prevented Defendants from opposing Mrs. Burkhart's request for punitive damages." In their view, cutting off Appellants' arguments as to their degree of culpability of fraud and concealment had the effect of conveying to the jury that the punitive damages determination was already made by the *Engle* jury—this despite the punitive damages statute requiring a higher burden of proof (clear and convincing evidence) with respect to proving the intentional conduct required to justify punitive damages.

We disagree. District courts have "broad discretion over the scope of closing argument." *United States v. Gaines*, 690 F.2d 849, 858 (11th Cir. 1982). "Absent a

21

showing of an abuse of discretion the district court will not be reversed for limiting summation as long as the defendant has the opportunity to make all legally tenable arguments that are supported by the facts of the case." *Id.* Here, based upon the way in which Appellants framed their closing arguments, we cannot conclude that the District Court erred when it interjected to clarify the legal standard for the jury.

The Florida Supreme Court's decision in *Engle* created a unique and difficult challenge for juries and courts considering punitive damages claims in individual progeny claims. In *Engle*, the Florida Supreme Court held that the jury's findings in Phase I established—with preclusive legal effect in all subsequent *Engle* progeny cases—the conduct elements of the plaintiffs' tort claims, which included fraud by concealment, civil-conspiracy concealment, breach of implied warranty, breach of express warranty, strict liability, and negligence. *Engle*, 945 So. 2d at 1254–55. However, the Court also concluded that the jury did not and could not establish the individualized, plaintiff-specific elements of those claims, namely, causation (did addiction cause each plaintiff's respiratory disease) and reliance (with regard to the fraudulent-concealment and conspiracy claims, did the plaintiffs rely on the tobacco companies' misrepresentations). *Id.* at 1263. Thus, the Phase I jury "did not determine whether the defendants were liable to anyone." *Id.* Nor could *Engle* establish the tobacco companies' liability for purposes of awarding punitive damages. Under Florida law, to find a defendant is liable for punitive damages, the jury must find "that the defendant was personally guilty of intentional misconduct or gross

22

negligence." Fla. Stat. § 768.72(2). The statute then defines "intentional misconduct" to mean "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." *Id.* § 768.72(2)(a). A plaintiff must prove such intentional misconduct by "clear and convincing evidence." *Id.* § 768.72(2).

Thus, while *Engle* conclusively established, by "the greater weight of the evidence," that Appellants concealed information and conspired to withhold that information for purposes of awarding compensatory damages under those respective torts, it could not establish, by clear and convincing evidence, that Appellants had *actual knowledge* of the wrongfulness of their conduct and nevertheless intentionally pursued that conduct.

The District Court sought to avoid confusion of this standard when it interrupted R.J. Reynolds' counsel during Appellants' closing remarks to make clarifying comments to the jury.[4] The District Court was concerned that counsel blurred the distinction between arguing that Appellants did not have knowledge of the wrongfulness of their conduct (for purposes of awarding punitive damages) and that they did not conceal information or conspire to conceal information at all (all for purposes of awarding compensatory damages under Burkhart's intentional tort

---

[4] Mr. Belasic represented Appellant R.J. Reynolds, but he argued in his closing remarks on behalf of all three Appellants.

23

claims).  On each occasion in which the District Court interrupted, the Court did so to clarify to the jury that Appellants could not challenge the *Engle* findings on concealment, because R.J. Reynolds' counsel framed his argument as challenging whether concealment ever occurred *at all*.

For example, before the Court interjected the second time, Mr. Belasic began with, "So let's talk about *whether or not it was concealed* and what the experts said." (Emphasis added).  Those same comments, "whether or not it was concealed," likewise preceded the District Court's refusal to allow Mr. Belasic to discuss Mr. Burns's testimony.  Later, Mr. Belasic stressed repeatedly that Appellants did not commit any wrongdoing: "*How is that fraud*? . . . . Would the companies *engage in wrongdoing* if they're going to spend all this money to make a safer cigarette that the government tries to shut down?  Would the companies *be engaged in wrongdoing* if they're working for ten years on published safer cigarette research . . . ?" (Emphasis added). These arguments made no mention of Appellants' knowledge of their wrongdoing or the lack thereof; instead, they were framed to discuss the lack of any wrongdoing at all.

It is certainly possible that Mr. Belasic was attempting to discuss publicly available research on the health risks of cigarettes and their own efforts to develop filters as evidence that Appellants lacked knowledge of the wrongfulness of their concealment, or even that the evidence did not support a finding of intentional conduct under the clear-and-convincing standard required for awarding punitive

24

damages. But Mr. Belasic did not frame his arguments this way, nor did he discuss the different evidentiary standard that applies under Florida's punitive damages statute. Thus, given the misleading way in which R.J. Reynolds framed its own arguments about Appellants' conduct, we find no fault in the District Court's intervention in Mr. Belasic's remarks to clarify the legal standard to the jury.

This is especially true considering that the jury was tasked with deciding both compensatory and punitive damages liability at the time Appellants made their closing arguments. This was not an argument made in a separate trial solely on the issue of punitive damages, occurring after Appellants' liability for compensatory damages had been determined. The jury in this case was instead tasked with answering questions about Burkhart's personal situation—class membership, causation, and reliance— upon which Appellants' compensatory liability to Burkhart would depend. At the same time, the jury was required to answer questions about Appellants' conduct— whether Appellants had actual knowledge of their wrongdoing and nevertheless intentionally pursued the conduct in question—upon which punitive damages liability would depend. And, the jury had to answer the latter questions while giving the *Engle* jury's findings as to Appellants' conduct preclusive effect for purposes of awarding compensatory damages. Thus, the District Court had to draw these distinctions carefully so that the jurors could keep these legal standards separate in their minds.

While this task was already delicate enough, Appellants' approach in closing argument made the Court's job even harder. And even when it did intervene to

25

preserve these distinctions, the District Court made sure to explain to the jury that

Appellants were allowed to argue against punitive damages under the clear-and-

convincing evidence standard. For example, during its final intervention during

Appellants' arguments, the Court explained:

> The question is whether they had actual knowledge of the wrongfulness
> and that there was a high probability of injury or damage and despite that
> knowledge intentionally pursued that course of conduct resulting in the
> plaintiff's injuries. That's the issue.

Thus, owing to the broader context of the case, the Court was rightfully

concerned that Appellants were attempting to muddy the legal waters for the jury by

arguing that they committed no fraud or concealment *at all*. We therefore find no

abuse of discretion in the District Court's careful explanation to the jury of the various

legal standards in response to Appellants' ambiguous comments during closing

argument.

## 2. The District Court's *Allen* Charge

Appellants next contest the District Court's *Allen* charge during the jury's

Phase II deliberations. Once the jury delivered its Phase I verdict, which established

Appellants' *liability* for compensatory and punitive damages, the trial moved to Phase

II, which was dedicated solely to setting a punitive damages *amount*. After the parties

presented their evidence and closing arguments, the jury entered deliberations and

quickly found it difficult to reach a unanimous verdict. The jury informed the Court

that it could not "come to a unanimous decision" and asked the Court what "the next

26

step" would be.  After conferring with the parties, the Court rejected Appellants'

request to give a pattern *Allen* charge and instead sent the following response:

> Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors.  So you must discuss the case with one another in trying to reach an agreement.  While you're discussing the case, don't hesitate to re-examine your own opinion and change your mind if you become convinced that you were wrong.  But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.  Remember that in a very real way, you're the judges, judges of the facts.  Your only interest is to seek the truth from the evidence in the case.

The Court explained to counsel that it chose to send this instruction instead of an

*Allen* charge because it was concerned about the coercive nature of *Allen* charges and

thus gave the above instruction to "make sure [it wasn't] imposing undue burden on

[the jurors] to change their opinions."

Forty minutes later, the jury again informed the Court it was unable to reach a

unanimous decision:

> Your Honor, after considering the evidence with other jurors, we have each decided the case for ourselves.  We examined our own opinions and considered and reconsidered the opinions of all jurors.  Unfortunately, we find we are still unable to reach a unanimous decision and it does not look likely that we will be able to do so without giving up honest beliefs.  Again, our apologies, but what is our next step?

At this point, the Court decided to deliver an *Allen* charge.  Appellants objected

on the grounds that "any further instruction would be unduly coercive."  The Court

overruled Appellants' objection and delivered this Circuit's pattern *Allen* charge,

along with some prefatory remarks.[5]

---

[5] The Court's complete *Allen* charge stated:

You sent us out a note indicating further that you cannot reach a unanimous verdict. And as I stated at the beginning of the case, you are the judges in this case. You must make your own honest decisions attempting to come to a unanimous verdict, but only if you can.

However, and, therefore, I emphasize that I cannot place, and am prohibited from placing upon you, undue pressure to reach a verdict if you honestly cannot. However, I am permitted to read you the following charge, specifically approved by the Supreme Court and by the Eleventh Circuit. And, therefore, I ask you to follow along with this instruction, please, as I read it.

Members of the jury[:]

I'm going to ask you to continue your deliberations, one last time, to reach a verdict. Please consider the following comments.

This is an important case. The trial has been expensive in terms of time, effort, money, and emotional strain to both the plaintiff and the defendant. If you fail to reach a verdict, the case remains open and may have to be tried again.

A second trial would be costly to both sides. And there's no reason to believe either side can try it again better or more exhaustively than they have tried it before you. Any future jury would be selected in the same manner and from the same source as you.

There's no reason to believe that the case could ever be submitted to a jury of people more conscientious, more impartial, or more competent to decide it, or that either side could produce more or clearer evidence.

It's your duty to consult with one another and to deliberate with a view to reaching an agreement, if you can do it, without violating your individual judgment.

You must not give up your honest beliefs about the evidence's weight or effect solely because of other jurors' opinions or just to return a verdict. But you must each decide the case for yourself, but only after you consider the evidence with your fellow jurors.

You shouldn't hesitate to re-examine your own views and change your opinion if you become convinced it's wrong.

The jury then resumed deliberations, and, fifty minutes later, returned a verdict. The jury awarded punitive damages in the amount of $1,250,000 against R.J. Reynolds, $750,000 against Philip Morris, and $500,000 against Lorillard.

Appellants argue that these instructions were unduly coercive.  They observe that this Court "still permits the standard *Allen* charge, but only grudgingly," on account of the coercive nature of such charges.  Thus, Appellants contend, because an *Allen* charge is already "borderline" coercive, any coercive conduct that occurs in addition to an *Allen* charge is enough to "tip the balance from a barely permissible instruction to an inherently coercive one."

We do not disagree with Appellants to the extent they contend additional coercive conduct by a District Court in addition to an *Allen* charge *could* tip the scales

---

To bring your minds to a unanimous result, you must openly and frankly examine the questions submitted to you with proper regard for the opinion of others and with willingness to re-examine your own views.

If a substantial majority of you is for a verdict for one party or the other, we have no idea whom, each of you who holds a different position ought to consider whether your position is reasonable.

It may not be reasonable since it makes so little impression on the minds of your fellow jurors who bear the same responsibility, serve under the same oath, and have heard the same evidence.

You may conduct your deliberations as you choose, but I suggest that you now carefully re-examine and reconsider all the evidence in light of the Court's instructions on the law.

You may take all the time that you need, but I remind you that in your deliberations, you are to consider the Court's instructions as a whole. You shouldn't single out any part of any instructions, including this one, and ignore others.

One last time, I'll ask you to return to the jury room and continue your deliberations.

29

in favor of undue jury coercion.  But that did not happen in this case.  Appellants claim the Court gave the jury three separate coercive instructions before and during deliberations.  The first so-called "instruction" occurred just before the jury retired to deliberate, when the Court told the jury, "I simply remind you that anything placed on each of the three lines must be a unanimous verdict."  Appellants claim that this reminder was an "unwarranted repetition [that] improperly suggested that the jury had to reach a verdict."  We reject this baseless argument: the District Court's statement speaks for itself.

Next, Appellants claim the District Court's instruction to the jury after the jury first informed the Court of its inability to reach a unanimous verdict "intensified the pressure" to reach a verdict.  Not so.  The statement was considerably weaker than a pattern *Allen* charge and made clear to the jurors that they should maintain their firmly held convictions.  The Court encouraged the jurors "to re-examine your own opinion and change your mind if you become convinced that you were wrong," but immediately followed that exhortation up by cautioning the jurors not to "give up your honest beliefs just because others think differently or because you simply want to get the case over with."  Despite Appellants' contention, the "clear import" of this instruction was not in any way a signal to the jury that "the court refused to accept a deadlock."  Indeed, the District Court would have been hard-pressed to craft a more balanced and non-coercive instruction to the jury.  This is especially true in light of the short length of time the jury had been deliberating when it sent its first note to the

30

Court.  After ten days of trial, the jury had deliberated for well under two hours.  The District Court was well within its discretion to conclude that a full-throated *Allen* charge was not yet appropriate and to instead respond to the jury in the manner in which it did.  *See United States v. Alonso*, 740 F.2d 862, 877 (11th Cir. 1984) ("The timing of an *Allen* charge is within the trial court's discretion.").

Finally, the *Allen* charge itself (which Appellants erroneously call "a third push for unanimity") was a verbatim use of the pattern *Allen* charge used in this Circuit— including the language making clear to the jurors that they were not expected to abandon their honest beliefs.  *See* Pattern Civ. Jury Instr. 11th Cir. 2.8; *United States v. Trujillo*, 146 F.3d 838, 846–47 (11th Cir. 1998) (finding no abuse of discretion when a district court used a modified *Allen* charge that "specifically request[ed] that no juror [wa]s expected to give up an honest belief he or she may have as to the weight or effect of the evidence." (quotations omitted)).  Reversal of a District Court on the basis of an *Allen* charge it delivered is warranted only if the charge was "inherently coercive."  *United States v. Brokemond*, 959 F.2d 206, 210 (11th Cir. 1992).  The District Court's pattern *Allen* charge in this case was not.

That the charge was given after the Court's prior instruction did not make that charge, or the totality of the circumstances, unduly coercive.  We have held that a District Court's delivery of two *Allen* charges in the same trial was not an abuse of discretion when the two charges were not coercive under the totality of the circumstances.  *See United States v. Davis*, 779 F.3d 1305, 1313 (11th Cir. 2015)

31

("[W]hat counts is not the number of instructions but the overall circumstances and risk of coercion."). In this case, the District Court initially instructed the jury to continue deliberating by using a communication significantly weaker than a typical *Allen* charge, and then followed up with a pattern *Allen* charge. The Court delivered both of those communications less than three hours after jury deliberations began. *See id.* at 1314 ("The risk of coercion increases as deliberations run longer."). In both of those communications, the Court expressly told the jurors not to abandon their honest convictions, and the Court told the jury in its *Allen* charge that this would be the last time it would instruct the jury to continue deliberating after an impasse. Thus, any reasonable juror would have been well aware that holding firm just one more time would have been acceptable and would have resulted in a mistrial, despite the fact that deliberations had gone on for less than three hours in total. Simply put, the Court's conduct was not coercive under those circumstances. We therefore find no abuse of discretion with respect to the Court's instructions to the jury during Phase II deliberations.

### D. *Comparative-Fault Reduction*

Appellants next argue that the trial court erred in refusing to reduce the compensatory award against them to reflect the jury's allocation of comparative fault.

Appellants advance two grounds to support a reduction in the compensatory damages award. First, they argue that Florida's comparative-fault statute mandates a reduction according to the jury's determination of Burkhart's comparative negligence.

32

The statute, Fla. Stat. § 768.81, mandates comparative-fault reduction in negligence and products-liability actions but does not apply "to any action *based upon* an intentional tort." *Id.* § 768.81(3)–(4) (emphasis added). In this case, the jury found Appellants liable for both negligence and intentional torts. Appellants argue that the statute is only "based upon an intentional tort" when "the entire action is founded or constructed on an intentional tort." (Internal quotations and alteration omitted).

This argument is foreclosed by the Florida Supreme Court's recent decision in *Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294 (Fla. 2017). In *Schoeff*, the Court held that "the comparative fault statute does not apply to *Engle* progeny cases in which the jury finds for the plaintiff on the intentional torts such that the compensatory damage awards in those cases are not subject to reduction." *Id.* at 298. In this case, the jury did just that. Thus, the comparative-fault statute does not mandate a reduction of Burkhart's compensatory damages award.

Next, Appellants argue, notwithstanding the inapplicability of the comparative-fault statute, Burkhart "waived any right to resist apportionment." They argue that she "affirmatively sough [sic] apportionment on her concealment and conspiracy claims" and "repeatedly invited the jury to consider her degree of fault for her injuries—without ever limiting that admission of responsibility to the claims for strict liability and negligence." They suggest Burkhart did so to "secure two significant advantages: first, by admitting partial fault without qualification, to stake out a position crafted to appear as reasonable as possible; and second, by urging a

33

negligence-to-concealment comparison, to skew the allocation of fault in her favor as much as possible."

Appellants further argue that Burkhart cannot avoid a comparative-fault damages reduction because the District Court led the jury to believe it would reduce the jury's damages award to Burkhart and then failed to do so after the verdict was received. In support of this argument, Appellants cite the Florida First District Court of Appeal's decision in *R.J. Reynolds Tobacco Co. v. Hiott*, 129 So. 3d 473 (Fla. Dist. Ct. App. 2014). In *Hiott*, the First District hypothesized that the jury might have "reached a different verdict on damages had it known" that the trial court would not reduce the plaintiff's damages afterwards. *Id.* at 481. Put differently, Appellants imply that the jury inflated its award to Burkhart in order to compensate for the damages reduction it expected the District Court to employ based on her comparative fault.

We find *Schoeff* instructive here as well. In *Schoeff*, the Florida Supreme Court overruled *Hiott* "to the extent [*Hiott*] held that the intentional tort exception is waived when an *Engle* progeny plaintiff argues comparative fault on the negligence counts." 232 So. 3d at 306. The Court also "reject[ed] the Fourth District majority's theory of waiver below." *Id.* The Fourth District in *Schoeff* had concluded that, "[b]ased on the overall theme of Plaintiff's representations to the jury, a reasonable jury would not possibly understand that its comparative fault determination was going to have no effect whatsoever on its compensatory damages award." *R.J. Reynolds Tobacco Co.*

34

*v. Schoeff*, 178 So. 3d 487, 494 (Fla. Dist. Ct. App. 2015).  The Florida Supreme

Court rejected this theory and held that the Fourth District abused its discretion in

finding waiver.  *Schoeff*, 232 So. 3d at 306.

In concluding that the Fourth District abused its discretion by finding waiver,

the Florida Supreme Court pointed out that "Mrs. Schoeff's complaint stated that she

would seek apportionment based on comparative fault on the counts for negligence

and strict liability; however not with respect to the counts constituting intentional torts

as pled in this action."  *Id.* (quotations omitted) (quoting Schoeff's complaint).  The

Court further observed "[t]he verdict form also listed the intentional torts after the

interrogative about apportionment, which immediately followed the negligence

claims."  *Id.*  And, the Court observed, "the defendants in [*Schoeff*] agreed to the

verdict form which asked the jury to determine whether Mr. Schoeff's smoking was a

result of each of the negligent and intentional tort offenses the *Engle* jury found RJR

to have committed."  *Id.*

In light of *Schoeff*'s analysis and upon careful review of the record and trial

transcripts in this case, we are persuaded that Burkhart did not waive her right to

avoid apportionment on account of Appellants' intentional torts.  Like Mrs. Schoeff,

Burkhart stated expressly in her complaint that she sought comparative-fault

apportionment as to her negligence claims, but not as to her intentional tort claims:

> Plaintiff's actions in using Defendant's cigarettes as marketed and
> intended by Defendants and the frequency, duration, and manner of
> Plaintiff's efforts to cease smoking, should be considered by the jury

35

along with Defendants' acts and omissions for purposes of determining whether the Plaintiff's acts or omissions rise to the level of negligence and constitute comparative fault, *however not with respect to the counts constituting intentional torts as pled in this action*.

(Emphasis added).

Moreover, as in *Schoeff*, the jury's comparative-fault percentage finding was grouped in the section of the verdict form dealing with Burkhart's negligence claim, directly below the section where the jury indicated whether it found each defendant liable for "negligence and strict-liability negligence." The sections dealing with Burkhart's intentional tort claims appeared above the section dealing with her negligence and strict-liability claims, on a different page and separated entirely from the comparative-fault percentages section. And, just as in *Schoeff*, the verdict form listed each cause of action separately, including the intentional torts, and "asked the jury to determine whether [Burkhart's] smoking was a result of each of the negligent and intentional tort offenses the *Engle* jury found [Appellants] to have committed." *Schoeff*, 232 So. 3d at 306.

Appellants argue, however, that Burkhart "repeatedly urged the jury to give her credit for accepting partial responsibility and to compare her own negligence to Defendants' supposed intentional misconduct." Our review of the trial transcript leads us to disagree with Appellants' characterization of Burkhart's position during trial. While Burkhart admitted her partial responsibility on numerous occasions during the trial, she never did so in an effort to urge the jury to apportion her

36

comparative fault against Appellants' intentional conduct. During his opening

statement, Burkhart's counsel observed that Burkhart's

> responsibility has to be judged compared to the cigarette companies,
> against the choices they made and the choices she made. . . . [W]e
> submit to you the evidence might show that about ten percent of the
> responsibility will go on Pauline Burkhart, but that is something that you
> will have to decide when you hear all of the evidence. And, of course,
> cigarette companies, well, they remain responsible 100 percent for their
> lies.

During closing argument, counsel told the jury that "Mrs. Burkhart bears some

responsibility . . . for her own actions." But he never suggested that this admission of

responsibility extended beyond the scope of her negligence and strict-liability claims.

The only instance in which Burkhart's counsel compared her negligent conduct

with Appellants' intentional conduct took place during his closing remarks. There,

counsel told the jury:

> Now, you've got a negligent pedestrian, but an intentional wrongdoing
> on the part of the driver; and under those circumstances, it seems pretty
> obvious that if you're trying to decide—allocate responsibility, fault
> between the two, who gets the lion's share of the fault?

It is true that this rhetorical question clearly compared Burkhart's negligent conduct

with Appellants' intentional conduct. However, in light of the entire body of the trial

record, we conclude that this statement cannot amount to a waiver of Burkhart's

apportionment rights with respect to her negligence claims. Appellants' argument—

that this statement and others made during trial, which failed to distinguish between

Burkhart's negligent conduct and Appellants' intentional conduct, amount to a waiver

37

of Burkhart's right to invoke the intentional tort exception—is the same argument made by the Fourth District in *Schoeff* when it found waiver "[b]ased on the overall theme of Plaintiff's representations to the jury." 178 So. 3d at 494. The Florida Supreme Court rejected this argument in light of the plaintiff's complaint and the jury's verdict form, and we reject Appellant's claim for the same reasons.

In addition to the aforementioned statements and jury instructions separating Burkhart's comparative negligence from Appellants' intentional conduct, the District Court made clear that apportionment only applied with respect to Burkhart's negligence claims. At one point during closing argument, the Court interrupted Burkhart's counsel to clarify to the jury "that comparative fault only applies to the unintentional torts, that is, negligence and strict liability." The Court further explained:

> [Comparative fault is] not a defense to fraud or concealment, but it is a defense to negligence; and therefore we ask you this question, and it does only apply to negligence and strict liability negligence, that is, if she's at fault, then what percentage is she at fault? That's comparative negligence. And, again, it only applies to the latter two causes of action.

The instructions did not in any way discuss comparative fault in the context of Burkhart's intentional tort claims. In contrast, the instruction on negligence and strict liability told the jury to "consider as to those claims the extent to which the Plaintiff's conduct was a legal cause of her own injuries." "Such a finding," observed the Court, "would not prevent the Plaintiff from recovering but would reduce her recoverable damages."

In sum, we conclude that the District Court did not abuse its discretion in concluding that Burkhart did not waive her right to avoid apportionment on account of the jury's intentional tort findings. Although counsel made remarks during closing argument that compared her negligent conduct with Appellants' intentional conduct, we find that these comments did not amount to a waiver of her right to avoid apportionment, given that her counsel and the District Court made clear to the jury at numerous times that comparative fault should only be considered as to Burkhart's negligence and strict-liability claims. This is so especially in light of *Schoeff*.

We further find that *Schoeff* forecloses Appellants' waiver argument with respect to the District Court's instruction to the jury that it would reduce the compensatory damages award according to Burkhart's comparative fault. In *Schoeff*, the Florida Supreme Court "reject[ed] the Fourth District majority's theory of waiver below." 232 So. 3d at 306. That theory was the same theory Appellants proffer with respect to the District Court's jury instruction. The Fourth District concluded in *Schoeff* that "[b]ased on the overall theme of Plaintiff's representations to the jury, a reasonable jury would not possibly understand that its comparative fault determination was going to have no effect whatsoever on its compensatory damages award." *Schoeff*, 178 So. 3d at 494. The Florida Supreme Court rejected this theory and held that the Fourth District abused its discretion in adopting it. *Schoeff*, 232 So. 3d at 306. Here, Appellants argue that the District Court "distinctly instructed the jury that it would reduce the amount of Mrs. Burkhart's damages by her share of comparative

fault, and then it failed to do so.  Telling the jury that it would reduce, and then refusing to reduce, improperly misleads the jury by definition."  This is the same argument the Florida Supreme Court rejected in *Schoeff*.  Accordingly, *Schoeff* forecloses Appellants' arguments with regard to the District Court's jury instruction.

E. *Federal Preemption and Due Process Limits on the* Engle *Jury's Findings*

Finally, Appellants argue that the District Court erred in denying Appellants' motion for judgment as a matter of law, which was raised on the basis of federal law.  They argue Burkhart's negligence and strict-liability claims are preempted by federal law and her intentional tort claims are barred by due process.  As Appellants concede, their preemption argument is foreclosed by this Court's en banc decision in *Graham*, which held that "that federal tobacco laws do not preempt state tort claims based on the dangerousness of all the cigarettes manufactured by the tobacco companies."  857 F.3d at 1186.

As to Appellants' due process argument,[6] *Graham* did not decide whether giving preclusive effect to the *Engle* jury's findings of concealment and conspiracy violates due process.  *See id.* at 1186 ("[G]iving preclusive effect to the findings of *negligence and strict liability* by the *Engle* jury in individual actions by *Engle* class members against R.J. Reynolds and Philip Morris does not deprive these tobacco companies of property without due process of law." (emphasis added)).  However, we

---

[6] This same issue is pending before this Court in *Searcy v. R.J. Reynolds Tobacco Co.*, No. 13-15258 (11th Cir. Sept. 12, 2013).

conclude that this Court's shared rationale in *Graham* and *Walker* controls the issue. Both of those cases make clear that treating as preclusive the *Engle* jury's findings as to the conduct elements of *Engle* progeny plaintiffs' fraudulent concealment and conspiracy claims does not violate due process.

In *Walker*, a consolidated appeal of two cases, juries found in favor of two *Engle* progeny plaintiffs on their strict-liability claims and in favor of one of those plaintiffs on his negligence claim, but found in favor of the tobacco companies in both cases with respect to the plaintiffs' fraudulent concealment and conspiracy claims. 734 F.3d at 1286. At trial, the District Courts had instructed the juries to treat the *Engle* jury's findings on the conduct elements of all of those claims as preclusive, and told the juries they were only responsible for deciding whether the class membership, causation, and damages elements were satisfied as to the two plaintiffs. *Id.*

The District Courts had done so in light of the Florida Supreme Court's opinion in *Philip Morris USA, Inc. v. Douglas*, which held that "[n]o matter the wording of the findings of the Phase I verdict form, the [*Engle*] jury considered and determined specific matters related to the defendants' conduct," and therefore that *Engle* progeny plaintiffs were "entitled to rely" on those findings in progeny cases in establishing their various tort claims. 110 So. 3d 419, 433 (Fla. 2013) (quoting *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1067 (Fla. Dist. Ct. App. 2010)). The tobacco companies took issue with the District Court's endorsement of Florida's approach to issue preclusion in *Douglas*, arguing that the *Douglas* Court's grant of preclusive

41

effect to the *Engle* jury's findings as to the tobacco companies' conduct in subsequent progeny cases violated the Due Process Clause.  *Walker*, 734 F.3d at 1280.

On appeal, this Court analyzed "whether giving full faith and credit to the decision in *Engle* . . . would arbitrarily deprive R.J. Reynolds of its property without due process of law."  *Id.* at 1287.  Although the plaintiffs in *Walker* lost on their concealment and conspiracy claims at trial, the Court's due process analysis considered the propriety of giving preclusive effect to *all* of the Phase I findings approved in *Engle*, which included the conduct elements of those intentional torts (whether the tobacco companies conspired to and did conceal information on the risks of smoking that was otherwise unavailable).  *See Walker*, 734 F.3d at 1287 (analyzing the constitutionality of giving preclusive effect to the "approved findings from Phase I" without distinguishing the negligence and strict-liability claims from the concealment and conspiracy claims); *Engle*, 945 So. 2d at 1255 (concluding "it was proper to allow the jury to make findings in Phase I on Questions 1 (general causation), 2 (addiction of cigarettes), 3 (strict liability), 4(a) (*fraud by concealment*)," and "5(a) (*civil-conspiracy-concealment*)" (emphasis added)); *Martin*, 53 So. 3d at 1072 ("[T]he Phase I jury findings given preclusive effect in *Engle* established the conduct elements of Mrs. Martin's strict liability, *fraudulent concealment*, *civil conspiracy* and negligence claims against RJR." (emphasis added)).

The Court analyzed the Florida Supreme Court's action under the due process framework and concluded the "decision of the Supreme Court of Florida to give

42

preclusive effect to the approved findings from [*Engle*] did not arbitrarily deprive R.J. Reynolds of property without due process of law."  *Walker*, 734 F.3d at 1287.  The Court observed that "R.J. Reynolds had a full and fair opportunity to litigate the issues of common liability in [*Engle*]."  *Id.* at 1288.  R.J. Reynolds, said the Court, "had an opportunity to contest its liability and challenge the verdict form that the trial court submitted to the jury."  *Id.*  Then, the Court observed, after losing at trial, R.J. Reynolds appealed the outcome to both the Florida Supreme Court, which affirmed the trial court, and the United States Supreme Court, which denied certiorari review. *Id.*  Moreover, the Court pointed out, R.J. Reynolds was never deprived of its right to contest its liability to the individual plaintiffs in subsequent progeny cases with respect to class membership, causation, reliance, and damages.  *Id.*  Finally, the Court concluded that R.J. Reynolds had the opportunity to argue to the Florida Supreme Court that it was "impossible to tell whether the [*Engle*] jury determined that [R.J. Reynolds] acted wrongfully in connection with some or all of its brands of cigarettes because the plaintiffs presented both general and brand-specific theories of liability," in which case giving the *Engle* jury's findings preclusive effect in individual progeny cases would be unwarranted.  *Id.* at 1289.  This last issue, the Court concluded, was a "question of fact" that the Florida Supreme Court decided—with the benefit of adverse argument by R.J. Reynolds.  *Id.*  Thus, R.J. Reynolds had the benefit of all the process required to satisfy the constitutional standard.

43

In *Graham*, this Court again focused on the preclusive effect of the *Engle* jury's findings with respect to negligence and strict liability.  Once again, as in *Walker*, the progeny plaintiff prevailed only on her negligence and strict-liability claims. *Graham*, 857 F.3d at 1180.  *Graham* thus did not address the due process question with regard to Graham's concealment and conspiracy claims.  As it did in *Walker*, however, the Court again focused on the procedural fairness of giving preclusive effect to the *Engle* jury's findings as to the conduct elements of Graham's claims. The Court reiterated that "[t]he Due Process Clause requires only that the application of principles of res judicata by a state affords the parties notice and an opportunity to be heard so as to avoid an arbitrary deprivation of property."  *Id.* at 1184.  Although the Court acknowledged that the Florida Supreme Court's decision in *Engle* "defined a novel notion of res judicata," *id.* at 1184, the Court observed:

> [O]ur review of the record establishes that the tobacco companies had notice that the Engle trial involved common evidence and theories of negligence and strict liability that applied to all cigarettes manufactured by all tobacco companies and sold to all members of the class during the relevant periods.  The tobacco companies were given an opportunity to be heard on the common theories in a year-long trial followed by an appeal to the Florida Supreme Court and later individual trials and appeals on the remaining issues of proximate causation, comparative fault, and damages.

*Id.* at 1185.

We are persuaded that this rationale, employed by this Court in *Walker* and *Graham*, applies equally to the Florida Supreme Court's similar grant of preclusive weight to *Engle* progeny plaintiffs' concealment and conspiracy claims.  In both of

44

those cases, the due process question depended upon an analysis of the defendant's opportunity to be heard in *Engle*. The concealment and conspiracy claims were litigated alongside the negligence and strict-liability claims in *Engle*. As with the negligence and strict-liability claims, Appellants had the opportunity to argue the conduct elements of the concealment and conspiracy claims brought against them. They likewise had the opportunity to protest the jury instructions given on those claims. They enjoyed the benefit of appellate review of the jury instructions as to those claims. And they had the opportunity to contest the Florida Supreme Court's factual finding in *Douglas* that the *Engle* jury's verdict, though ambiguous, established the individualized conduct elements of the plaintiffs' negligence, strict-liability, fraudulent concealment, and conspiracy claims. Finally, Appellants still enjoyed and continue to enjoy the right to litigate the causation and reliance elements of those intentional tort claims. As we acknowledged in *Walker* and *Graham*, the Florida Supreme Court in *Engle* created a novel concept of res judicata, but that concept does not offend the Due Process Clause.

### III.

For the aforementioned reasons, we affirm the judgment of the District Court in all respects.

**AFFIRMED.**

45